**Ysabel ROSA, Plaintiff–Appellant,**

v.

**John S. CALLAHAN, Acting Commissioner of Social Security, Defendant–Appellee.**

No. 98–6079.

United States Court of Appeals, Second Circuit.

Argued Dec. 8, 1998.

Decided Feb. 5, 1999.

Jill Ann Boskey, Center For Disability Advocacy Rights ("CeDAR"), Inc., New York, New York, for Plaintiff–Appellant.

Linda A. Riffkin, Assistant United States Attorney, New York, New York (Mary Jo White, United States Attorney for the Southern District of New York, Steven M. Haber, Assistant United States Attorney, New York, New York, on the brief), for Defendant–Appellee.

Before: KEARSE, STRAUB and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge:

Plaintiff-appellant Ysabel Rosa applied for Social Security disability benefits in late February 1995. She claimed that she was disabled when a refrigerator door fell against her while she worked as a cook's helper in October 1993. Defendant-appellee, the Commissioner of Social Security (the "Commissioner"), denied Rosa's application for disability benefits under the Social Security Act (the "Act"), 42 U.S.C. § 301 *et seq.* An administrative law judge (the "ALJ") subsequently reviewed the matter and upheld the Commissioner's decision. Rosa then filed this action in the United States District Court for the Southern District of New York (Cote, *J.*). Rosa now appeals from the March 11, 1998 judgment entered by the district court affirming the Commissioner's decision. We find that the denial of disability benefits was based upon an incomplete and inadequate record. Accordingly, we vacate the district court's decision and remand the case to the Commissioner for further development of the record and reconsideration of Rosa's application.

## BACKGROUND

A. Factual History

Rosa was born in the Dominican Republic on July 2, 1963. She came to the United States in 1984, and although she subsequently graduated from high school, Rosa is not fluent in English. After arriving in this country, Rosa worked steadily at assorted jobs until the day that she sustained her injuries. From June 1984 to May 1985, Rosa worked in a factory packing children's clothes, and from June 1985 to October 1993, she worked as a cook's helper. While working at this most recent job, Rosa was injured when a refrigerator door fell against her in October 1993. Rosa has not worked since that incident.

On the day of her injury, Rosa was treated at the emergency room at Bellevue Hospital

where x-rays were taken of her. Soon thereafter, on November 1, 1993, Rosa began physical therapy three times per week with Dr. Jose Acevedo. In February 1994, at Dr. Acevedo's suggestion, Rosa began seeing Dr. Enrique Ergas. Dr. Ergas's notes describe nine visits with Rosa between February 16, 1994 and June 28, 1995. In support of her disability application, Rosa also submitted a one-page medical assessment by Dr. Ergas diagnosing Rosa with near total disability. On that form, Dr. Ergas checked a series of boxes indicating that Rosa was incapable of doing any work requiring even minimal lifting or carrying. The doctor also indicated that Rosa was incapable of either sitting or standing for more than one to two hours during the course of an eight-hour work day.

At the request of the New York State Office of Disability Determinations, Rosa visited Dr. K. Seo, an orthopedist, for a consultative examination on April 27, 1995. In his three-page report, Dr. Seo noted that Rosa had a normal range of motion in both shoulders, that she complained of joint pain in her right shoulder, that she had "[d]iminished sensation of the right at the level of C7 and C6," and that she had slightly limited muscle strength in her right arm. (Medical Report by Dr. K. Seo (Apr. 27, 1995) [hereinafter Seo Report].) Dr. Seo also reported that Rosa had no muscular atrophy in her thighs or legs and that she had a normal range of motion in her hip, knee, and ankle joints. At the close of his report, Dr. Seo reached the following conclusions: "Functionally, due to above, presently, she has difficulty lifting and carrying heavy objects, standing and walking for prolonged periods. Prognosis is fair."[1]

The Commissioner sent Rosa for a second consultative examination by another orthopedist, Dr. A. Sarreal, on August 16, 1995. In his report, Dr. Sarreal recorded that Rosa was "independent in dressing, bending and sitting" and that she "got on and off the examining table independently with slight discomfort." (Medical Report by Dr. A. Sarreal (8/16/95) [hereinafter Sarreal Report].)

In his clinical observations, Dr. Sarreal noted a normal range of motion in Rosa's left shoulder but recorded slightly reduced motion and sensation in her right shoulder and on her right side. The doctor also noted that while Rosa's "[f]inger and hand dexterity and manipulation [were] good," she had a "diminished ... grasp on the right hand." Additionally, Dr. Sarreal detected "tenderness" in Rosa's right neck area and "upper trapezius muscle." As for Rosa's "lower extremities," Dr. Sarreal reported a range of motion within "normal limits" and an absence of redness or swelling. Based upon these findings, Dr. Sarreal reached the following conclusions regarding Rosa's condition: "My medical opinion regarding this individual's ability to do work-related physical activities due to the neck right trapezius and low back pain; lift, carry, stand, walk, push and pull; limited." Dr. Sarreal also reported that Rosa's prognosis was "fair."

### B. The Administrative Hearing

In late February 1995, Rosa applied for disability benefits on the basis of her injuries. The Commissioner denied Rosa's application, both initially and on reconsideration. Rosa then requested a hearing, and appeared before Administrative Law Judge Mary Cerbone on March 15, 1996. Rosa was represented by a "legal service assistant" and testified with the aid of an interpreter. During the twenty-minute hearing, Rosa recounted her background and work experience. She went on to describe the incident in which she was injured and the treatment she received. Rosa explained that as of the time of the hearing, she was still visiting Dr. Ergas and that he had prescribed a pain medication, Naprosyn, and certain nightly exercises.

In describing her injuries, Rosa complained of constant physical pain and occasional headaches. In particular, Rosa testified that her right side felt "very dull and heavy, like if my right side was dead." She

---

1. Following her injuries, Rosa also applied for workers' compensation benefits and was examined by a doctor in connection with her application. The report from that examination is barely legible, but it appears that the examining physi-

cian found that Rosa suffered from a number of impairments to her right side including limited shoulder motion, a poor hand grip, and muscle spasms.

claimed that she could not stand for more than fifteen minutes at a time, that she was unable to bend or kneel, and that she could not remain seated for more than fifteen or twenty minutes without experiencing back pain. Rosa also described weakness and numbness in her right hand. As a result of her injuries, Rosa complained that she was unable to go out except for medical appointments and occasional church visits, that she needed her daughter to bathe her, and that she had to rely on friends and relatives to attend to her household chores and shopping.

The ALJ issued a decision denying Rosa's claim on April 18, 1996. The ALJ found that Rosa had not engaged in substantial gainful activity since the onset of her alleged disability and that she had "severe musculoskeletal impairments" preventing her from performing her past relevant work. The ALJ also found, however, that Rosa "retained the residual functional capacity to perform a full range of sedentary work activity." The ALJ based this conclusion entirely upon her evaluation of Dr. Ergas's dictated notes and medical assessment and the two reports completed by the consulting physicians, Drs. Seo and Sarreal. The ALJ did not obtain any records from Bellevue, where Rosa was treated initially, nor from Dr. Acevedo, the physical therapist identified by Rosa as the doctor who treated her for over a year beginning almost immediately after her injury.

The ALJ cited several reasons for rejecting Dr. Ergas's assessment that Rosa was incapable of sedentary work. Primarily, the ALJ reasoned that Dr. Ergas's one-page medical assessment was·contradicted by the information in his underlying notes. For instance, Dr. Ergas reported that Rosa's x-rays, taken more than a year after Rosa sustained her injuries, were negative. Dr. Ergas's notes also indicated that Rosa had "good range of motion in the cervical spine, with slight tenderness only at the extremes of range of motion." The ALJ further emphasized that Dr. Ergas did not report any muscle spasms "to corroborate any loss of motion" described elsewhere in his report. Moreover, the ALJ found that Dr. Ergas failed to report any "positive neurological signs ... other than a single notation of

weakness affecting the right shoulder." On the basis of these considerations, the ALJ concluded that Dr. Ergas's notes did "not contain objective evidence of such advanced abnormalities as could be expected to result in [the] extensive limitations" reported by the doctor in his medical assessment.

The ALJ also based her denial of benefits on the reports submitted by the consulting physicians. Although Dr. Seo's and Dr. Sarreal's findings "did not necessarily corroborate each other," the ALJ found that each doctor described findings that were "consistent with [Rosa's] ability to perform a full range of sedentary work activity." The ALJ noted that "Dr. Seo reported that [Rosa] had reduced sensation in the right C6 and C7 distribution, whereas Dr. Sarreal found sensation to be reduced in the right C8 distribution." Also, "whereas Dr. Seo ... found sensation to be reduced in the right S1 distribution, Dr. Sarreal did not report such a finding." Additionally, Dr. Sarreal reported that Rosa had reduced strength "on extension of the right extensor halluces longus, although Dr. Seo found motor strength to be intact in the lower extremities." In short, although Drs. Seo and Sarreal reported findings that were not fully consistent, the ALJ found it significant that neither doctor described any physical impairments suggesting a "pathology .c.c. so advanced" as to prevent Rosa "from sitting or standing for more than one or two hours in an eight-hour workday."

Finally, based on her interpretation of the medical evidence, the ALJ concluded that Rosa's testimony "as to the frequency and severity of her pain" simply was "not fully credible." Here again, the ALJ emphasized that Dr. Ergas made only a "vague finding" of weakness in Rosa's right shoulder and that Drs. Seo and Sarreal identified an assortment of seemingly mild physical limitations, none of which, in the ALJ's view, could account for Rosa's complaints. The ALJ therefore concluded that the medical record failed to support the existence of any physical impairments sufficient to render Rosa disabled.

C. The Post–Administrative Proceedings

The ALJ's April 18 decision rejecting Rosa's claim for disability benefits became

final when the Appeals Council denied her request for review on December 20, 1996. Rosa then filed her complaint in this action on March 10, 1997. Both parties subsequently moved for judgment on the pleadings, and on March 9, 1998, the district court granted the Commissioner's motion and dismissed the complaint. The court held that the ALJ's decision denying Rosa's application for benefits was supported by "substantial evidence." This appeal followed.

## DISCUSSION

"In reviewing the denial of [Social Security] benefits by the [Commissioner], 'our focus is not so much on the district court's ruling as it is on the administrative ruling.'" *Schaal v. Apfel,* 134 F.3d 496, 500–01 (2d Cir.1998) (quoting *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991)). "It is not our function to determine *de novo* whether [a plaintiff] is disabled .c.c.c" *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996). Rather, "[w]e set aside [an] ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." *Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir.1998). Substantial evidence, however, is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pratts,* 94 F.3d at 37 (internal quotation marks omitted) (citations omitted).

To be "disabled" under the Act and therefore entitled to benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore, an individual's impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration (the "SSA") has promulgated a five step procedure for evaluating disability claims. 20 C.F.R. § 404.1520. This Circuit has implemented that procedure as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience .... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam); *see also Pratts,* 94 F.3d at 37 (stating five step procedure). "Once a disability claimant proves that his severe impairment prevents him from performing his past work [*i.e.,* at step four], the [Commissioner] then has the burden of proving that the claimant still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986); *see also Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996) ("If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working."); *Aubeuf v. Schweiker,* 649 F.2d 107, 112 (2d Cir.1981) ("When the claimant has established that his impairment prevents him from returning to his previous employment, 'the burden shifts to the [Commissioner], who must produce evidence to show the existence of alternative substantial gainful work which exists in the national

economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training.' ") (quoting *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980)).

 "In the ordinary case," the Commissioner meets his burden at the fifth step "by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986)." *Bapp*, 802 F.2d at 604. The grids "take[ ] into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience." *Zorilla v. Chater*, 915 F.Supp. 662, 667 (S.D.N.Y.1996). Based on these considerations, the grids indicate whether the claimant can engage in any substantial gainful work existing in the national economy. Although the grid results are generally dispositive, exclusive reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's physical limitations. In particular, "sole reliance on the [g]rid[s] may be precluded where the claimant's exertional impairments are compounded by significant nonexertional impairments that limit the range of sedentary work that the claimant can perform."[2] *Id.* In these circumstances, the Commissioner must "introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." *Bapp*, 802 F.2d at 603.

In this case, the ALJ undertook the prescribed five step analysis and found that Rosa had satisfied the first four steps. The ALJ determined, more specifically, that (1) Rosa had "not engaged in substantial gainful activity since her alleged onset of disability," (2) she had "severe musculoskeletal impairments," (3) these impairments did not meet "the level of severity of any impairment contained in Appendix I," and (4) the impairments nevertheless "prevent[ed] her from performing her past relevant work." Thus, as the ALJ recognized, it was the Commissioner's burden to demonstrate that Rosa had retained "the functional capacity to perform a full range of sedentary work."[3] The ALJ found that the Commissioner met this burden and that the grids applied to preclude a finding of disability. The ALJ based her ruling upon two primary conclusions. First, she determined that the clinical observations and medical reports by Rosa's treating physician, Dr. Ergas, did not support his assessment that Rosa was incapable of sitting and standing for extended periods over the course of a work day. Second, the ALJ concluded that the reports submitted by the two consulting physicians, Dr. Seo and Dr. Sarreal, were "consistent" with Rosa's ability to meet the demands of sedentary employment. On appeal, plaintiff argues, among other things, that the ALJ lacked an adequate basis to permit either of these two conclusions and that the ALJ ignored evidence of a significant nonexertional impairment affecting Rosa's ability to use and manipulate her right hand.

## A. The Treating Physician Rule

 The opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsis-

---

**2.** An exertional limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (*i.e.*, sitting, standing, walking, lifting, carrying, pushing, and pulling). *Zorilla*, 915 F.Supp. at 667 n. 3 (citing 20 C.F.R. § 404.1569a(b)). "A nonexertional limitation is one imposed by the claimant's impairments that affect her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments and pain." *Sobolewski v. Apfel*, 985 F.Supp. 300, 310 (E.D.N.Y.1997) (citing 20 C.F.R. § 404.1569a(a), (c)).

**3.** "Sedentary work is the least rigorous of the five categories of work recognized by SSA regu-

lations. These include 'very heavy', 'heavy,' 'medium,' 'light,' and 'sedentary.'" *Schaal*, 134 F.3d at 501 n. 6 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2). "Sedentary work .c.c. generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour work day." *Perez*, 77 F.3d at 46; *see also Carroll v. Secretary of Health and Human Servs.*, 705 F.2d 638, 643 (2d Cir.1983) ("By its very nature 'sedentary' work requires a person to sit for long periods of time even though standing and walking are occasionally required."). Sedentary work also involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a).

tent with other substantial evidence. *See Clark v. Commissioner of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.1998) (citing 20 C.F.R. § 404.1527(d)(2)); *see also Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir.1993) (same). In analyzing a treating physician's report, "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." *McBrayer v. Secretary of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir.1983); *see also Balsamo*, 142 F.3d at 80–81 (citing *McBrayer*); *Wagner v. Secretary of Health and Human Servs.*, 906 F.2d 856, 862 (2d Cir.1990) ("[A] circumstantial critique by [a] non-physician[ ], however thorough or responsible, must be overwhelmingly compelling" to justify a denial of benefits). In this case, however, the ALJ did exactly that.

■ In rejecting Dr. Ergas's finding of disability, the ALJ emphasized that Dr. Ergas "did not report findings of muscle spasm to corroborate any loss of motion." By attaching such significance to this omission, however, the ALJ made fundamentally the same error as this Court has identified on at least two occasions. *See Wagner*, 906 F.2d at 861; *see also Balsamo*, 142 F.3d at 81. In *Wagner*, we held that an ALJ had no sufficient basis for concluding that a treating physician's failure to report that a claimant suffered from "headaches and left-sided weakness" precluded a diagnosis of "hemiplegic migraine." *Wagner*, 906 F.2d at 861. In *Balsamo*, we similarly found that an ALJ had improperly made a medical determination by concluding that an absence of "atrophy of any muscle groups" was inconsistent with a finding of disability. *Balsamo*, 142 F.3d at 81. As in each of these cases, the ALJ here improperly "set [her] own expertise against that of" the treating physician. *Id.* (internal quotations marks omitted). Indeed, as a "lay person[ ]," the ALJ simply was not in a position to know whether the absence of muscle spasms would in fact pre-

clude the disabling loss of motion described by Dr. Ergas in his assessment.[4] *Wagner*, 906 F.2d at 861. Accordingly, we find nothing so "overwhelmingly compelling" in the ALJ's critique of Dr. Ergas's findings as to permit the Commissioner to "overcome" an otherwise valid medical opinion. *Id.* at 862.

■ One of our recent opinions confirms, moreover, that an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record. *See Schaal*, 134 F.3d at 505 ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte.*"); *see also Hartnett v. Apfel*, 21 F.Supp.2d 217, 221 (E.D.N.Y.1998) ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly"). In fact, where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history "even when the claimant is represented by counsel or ... by a paralegal." *Perez*, 77 F.3d at 47; *see also Pratts*, 94 F.3d at 37 ("It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.' This duty ... exists even when ... the claimant is represented by counsel.") (citations omitted) (alterations in original).[5]

In this case, which involved a non-English speaking claimant represented only by a "legal assistant," there were numerous gaps in the administrative record that should have prompted the ALJ to pursue additional information regarding Rosa's medical history. The ALJ had before her only Dr. Ergas's sparse notes which reflected nine visits between himself and Rosa, considerably fewer

---

4. The ALJ's emphasis on the absence of any reported spasms is especially curious. The workers' compensation physician who met with Rosa specifically reported that she suffered from spasms. The ALJ did not address this finding in her report.

5. The *Perez* decision also demonstrates the flipside of this same proposition. Specifically, where there are no obvious gaps in the administrative record, and where the ALJ already possesses a "complete medical history," the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim. *Perez*, 77 F.3d at 48.

visits than the two likely had based upon Rosa's testimony suggesting monthly treatment over a period of years. Moreover, Dr. Ergas's assessment was only one page in length and, as the ALJ recognized, wholly conclusory. Having nevertheless failed to request any additional records or support from Dr. Ergas, the ALJ was left to base her conclusions on incomplete information that was necessarily "conclusive of very little." *Wagner,* 906 F.2d at 861 ("These 'notes' take up a single page for the three years at issue. . . . It thus cannot be seriously argued that they represent an exhaustive record of [claimant's] condition over the whole period."). Confronted with this situation, the ALJ should have taken steps directing Rosa to ask Dr. Ergas to supplement his findings with additional information. It is entirely possible that Dr. Ergas, "[i]f asked," could have provided a sufficient explanation for any seeming lack of support for his ultimate diagnosis of complete disability. *See Clark,* 143 F.3d at 118. As this Court recognized in *Clark,* a treating physician's "failure to include this type of support for the findings in his report does not mean that such support does not exist; he might not have provided this information in the report because he did not know that the ALJ would consider it critical to the disposition of the case." *Id.*

Aside from her failure to seek additional information from Dr. Ergas, the ALJ also failed to obtain or attempt to obtain the records of a number of other physicians identified by Rosa, both during her testimony and in her meetings with Drs. Seo and Sarreal. For instance, Rosa testified that she was treated at Bellevue on the day she sustained her injuries and that she was x-rayed during her visit to the hospital emergency room. The record before the ALJ, however, did not include any materials from that visit. *See Cruz v. Sullivan,* 912 F.2d 8, 12 (2d Cir.1990) ("[T]he ALJ only asked at which hospital Cruz had been treated, and yet did not seek to obtain those hospital records."). It was also apparent from Dr. Ergas's notes that Rosa had been visiting a physical therapist, Dr. Acevedo, on a regular basis over a significant period of time. Again, the record included no reports or materials reflecting that course of treatment. Furthermore, Drs. Seo

and Sarreal each reported that Rosa had been treated both by an orthopedic surgeon and by a neurologist, but the ALJ took no steps to identify or contact those physicians. Had the ALJ pursued additional information from any or all of these sources, it is at least possible that the record would have included sufficient information to sustain plaintiff's claim of disability.

In summary, the "scant record" before us "reveals a host of lost opportunities" for the ALJ to have developed the facts of this case before rejecting the disability finding made by Rosa's treating physician. *Cruz,* 912 F.2d at 11; *see also Pratts,* 94 F.3d at 38 ("[T]he record before us is simply inadequate to support a denial of benefits. Much of [the claimant's] medical history is missing. . . . "). By foregoing those opportunities, and by rejecting a treating physician's medical assessment without fully developing the factual record, the ALJ committed legal error.

### B. Consulting Physicians

 As the primary basis for her conclusion that Rosa retained the residual functional capacity to meet the demands of sedentary work, the ALJ relied on the reports submitted by the consulting physicians. Neither Dr. Seo nor Dr. Sarreal purported to address in any direct way, however, Rosa's ability to function in a sedentary job. In fact, to the extent that either report touched upon the exertional abilities necessary for such work, *e.g.,* "lift[ing], carry[ing], stand[ing], walk[ing]," each doctor reported assorted limitations. (Seo Report ("Functionally . . . she has difficulty lifting and carrying heavy objects, standing and walking for prolonged periods."); Sarreal Report ("My medical opinion regarding this individual's ability to do work-related physical activities . . .; lift, carry, stand, walk, push and pull; limited.").) The ALJ nevertheless determined that none of these identified limitations was severe. On this basis, the ALJ concluded that the two reports were "consistent" with Rosa's ability to meet the demands of sedentary work and that the reports therefore provided "substantial evidence" that Rosa was not disabled. Rosa argues that the ALJ mistakenly permitted the Commissioner to satisfy its

burden of proof without requiring affirmative evidence demonstrating Rosa's residual functional capacity to meet the demands of sedentary work. We agree.

This Court has refused to uphold an ALJ's decision to reject a treating physician's diagnosis merely on the basis that other examining doctors reported no similar findings. *See Carroll*, 705 F.2d at 643; *cf. Wagner*, 906 F.2d at 861 (rejecting argument that Commissioner can "discard a treating doctor's opinion on the basis of prior omissions in the record"). In *Carroll*, as in this case, the claimant's treating physician reported that the claimant suffered from various impairments preventing him from meeting the demands of sedentary work. The ALJ disregarded this finding, however, because the three remaining doctors who had examined the claimant reached no such conclusions. Those doctors, however, "were never asked what work or activity, such as sedentary employment, [the claimant] *could* perform and hence expressed no opinion on that subject." *Carroll*, 705 F.2d at 643. Emphasizing that it was the Commissioner's burden to demonstrate that the claimant was capable of sedentary work, the Court therefore held that the ALJ's conclusion that the claimant was capable of such work was "not supported by substantial evidence." *Id.*

In this case, the ALJ relied on exactly the kind of rationale that we rejected in *Carroll*. As mentioned, the ALJ reasoned that the reports by the consulting physicians did not identify any serious impairments, and that those reports were therefore "consistent" with a finding that Rosa retained the residual functional capacity to meet the exertional demands of sedentary work. Those reports were consistent with this conclusion, however, only to the extent that they were silent on the issue. Indeed, there was no indication in the reports that the consultants intended anything by their silence or that they set out to "express [an] opinion on [the] subject" of Rosa's sedentary work capacity. *Carroll*,

705 F.2d at 643. Under these circumstances, the Commissioner was precluded from relying on the consultants' omissions as the primary evidence supporting its denial of benefits. *Id.; see also Sobolewski*, 985 F.Supp. at 314 ("[T]he burden of proof is on the Commissioner to offer positive evidence that plaintiff can perform sedentary work, and the burden is not carried merely by pointing to evidence that is consistent with his otherwise unsupported assertion.").

This basic precept, that the Commissioner must present affirmative evidence to sustain its burden of proof, becomes all the more obvious in light of the assorted discrepancies between the reports submitted by Drs. Seo and Sarreal. In defending the ALJ's determination, the Commissioner argues that the consulting doctors did not provide a comprehensive list of what Rosa "could do" but that "both physicians listed what plaintiff could *not* do." (Brief for Def.-Appellee at 38.) The Commissioner therefore reasons that the ALJ properly concluded that Rosa did not suffer from any impairments unlisted by either of the consulting physicians. As the ALJ recognized, however, the two consulting physicians' reports did not "corroborate" one another—each doctor identified certain physical limitations not identified by the other.[6] Given that there were discrepancies between the two reports, there was simply no basis for the ALJ to conclude that either doctor intended to provide, or succeeded in providing, a full accounting of Rosa's physical impairments. *See Ferraris v. Heckler*, 728 F.2d 582, 586–87 (2d Cir.1984) (rejecting ALJ's denial of benefits where that denial was based, in part, upon a non-existent "consensus" between four consulting physicians).

In sum, the ALJ did not have substantial evidence justifying her decision that Rosa retained the residual functional capacity to meet the exertional demands of sedentary work. The ALJ erred in substituting her own medical judgment for the judgment offered by Dr. Ergas, particularly without hav-

---

**6.** For instance, as the ALJ noted, "Dr. Seo reported that [Rosa] had reduced sensation in the right C6 and C7 distribution, whereas Dr. Sarreal found sensation to be reduced in the right C8 distribution." Also, "whereas Dr. Seo ... found sensation to be reduced in the right S1 distribu-

tion, Dr. Sarreal did not report such a finding." Additionally, Dr. Sarreal reported that Rosa had reduced strength "on extension of the right extensor halluces longus, although Dr. Seo found motor strength to be intact in the lower extremities."

ing provided Dr. Ergas an opportunity to supplement his submission to the Commissioner and without seeking Rosa's full medical records from all of her treating sources. Also, the ALJ improperly permitted the government to meet its burden of proof on the basis of an absence of evidence supporting Rosa's contrary position. Accordingly, on the inadequate record before us, we cannot uphold the ALJ's decision to reject Rosa's claim for disability benefits.

## C. Non–Exertional Impairments

As explained at the outset of our discussion, after finding that Rosa retained the residual functional capacity to meet the demands of sedentary work, the ALJ then applied the regulatory grids to conclude that Rosa was not disabled. On appeal, Rosa argues that resort to the grids was improper, not only because the ALJ erred in concluding that Rosa retained the residual functional capacity to meet the exertional demands of sedentary work, but also because the ALJ ignored evidence that Rosa suffered from a nonexertional impairment to her right hand and arm.

"Generally speaking, if a claimant suffers only from exertional impairments, *e.g.*, strength limitations, then the Commissioner may satisfy her burden by resorting to the applicable grids. For a claimant whose characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he is disabled." *Pratts*, 94 F.3d at 38–39. Where significant nonexertional impairments are present at the fifth step in the disability analysis, however, "application of the grids is inappropriate." *Bapp*, 802 F.2d at 605–06. Instead, the Commissioner "must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." *Id.* at 603.

 As with Rosa's exertional impairments, *i.e.*, her ability to sit and stand over

extended periods during an eight hour work day, we conclude that there is not substantial evidence to support the ALJ's rejection of Rosa's claim that she suffered from nonexertional impairments. As Rosa points out, the full range of sedentary work requires more than sitting, standing, walking, lifting and carrying. " 'Most unskilled sedentary jobs require good use of the hands and fingers for repetitive finger actions.' " *Sobolewski*, 985 F.Supp. at 310 (quoting S.S.R. 83–10). Rather than demonstrating Rosa's ability to meet these demands of sedentary employment, the record actually raises significant doubts as to Rosa's capacity to perform these activities.

Dr. Ergas specifically reported that Rosa was incapable of lifting or carrying even light weights on account of reduced strength in her right hand. Neither Dr. Seo nor Dr. Sarreal made any explicit determination refuting this. In fact, the two consultant reports offer at least some suggestion that Dr. Ergas's diagnosis was correct. Indeed, Dr. Sarreal noted Rosa's "diminished hand grasp on the right hand," and Dr. Seo diagnosed Rosa with "myofascial pain of the right shoulder and lower back." For the reasons discussed previously, then, the ALJ was left with no basis to conclude that the Commissioner met its burden of demonstrating that Rosa retained the residual functional capacity to meet the nonexertional demands of sedentary work. The Commissioner simply failed to come forward with sufficient affirmative evidence on this point. Thus, even if the ALJ had been correct in concluding that Rosa retained the residual functional capacity to meet the exertional demands of sedentary work, it would have been inappropriate for the ALJ to resort to the grids, in lieu of testimony from a vocational expert, in order to determine whether Rosa was disabled.[7]

## D. Disposition

 " 'Where there are gaps in the administrative record or the ALJ has applied

---

**7.** Rosa raises an additional alleged error in the ALJ's decision. Specifically, Rosa complains that the ALJ did not identify a sufficient basis for rejecting the testimony in which Rosa described the extent and the nature of her pain. The ALJ deemed that testimony "not fully credible" on the specific basis that it was contradicted by the

medical evidence. Because we have concluded that the ALJ was incorrect in her assessment of the medical evidence, we cannot accept her conclusion regarding Rosa's credibility. The Commissioner must therefore reconsider Rosa's testimony in light of this opinion and in light of the evidence developed on remand.

an improper legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence.' " *Pratts,* 94 F.3d at 39 (quoting *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in original); *see also Sobolewski,* 985 F.Supp. at 314 ("Where there are gaps in the administrative record, remand to the Commissioner for further development of the evidence is in order."). In other situations, where this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for a calculation of benefits.[8] *See, e.g., Balsamo,* 142 F.3d at 82. This case, in our view, is one in which remand for further development of the evidence is the wiser course.

In *Balsamo,* the Court remanded for the calculation of benefits because the ALJ reached a mistaken conclusion on an otherwise complete record. In fact, the ALJ rejected a treating physician's disability determination *"solely* on the basis that the opinions allegedly conflicted with the physicians' own clinical findings." *Id.* at 80 (emphasis added). Here, by contrast, the extent of Rosa's injuries was not at all clear, and the ALJ failed to develop the record sufficiently to make any appropriate determination in either direction. Indeed, as explained, the ALJ failed to obtain adequate information from Rosa's treating physician, Dr. Ergas; she failed to seek potentially relevant information from a number of other doctors and treatment facilities; and she jumped to conclusions that were not adequately supported by the consultant reports before her. Much as in *Pratts,* then, the ALJ failed to "fulfill her duty in [claim-

ant's] case in several respects." *Pratts,* 94 F.3d at 37. Because "further findings" would so plainly help to assure the proper disposition of Rosa's claim, we believe that remand is "particularly appropriate" in this case. *Id.* at 39.

## CONCLUSION

For the foregoing reasons, we vacate the decision of the district court with instructions to remand the matter to the Commissioner for further proceedings consistent with this opinion. Specifically, the Commissioner is directed to:

1. Request that Rosa secure complete medical records from all of the doctors and institutions that treated Rosa in connection with her work-related injuries (including, but not limited to, Dr. Acevedo, the as yet unidentified orthopedic surgeon and neurologist, and Bellevue Hospital).

2. Request an explanation from Dr. Ergas supporting his diagnosis of total disability.

3. Enquire as to whether either consulting physician, Dr. Seo or Dr. Sarreal, has an opinion as to whether Rosa retains the residual functional capacity to meet both the exertional and the nonexertional demands of sedentary work.

4. Reassess Rosa's testimonial credibility in light of this opinion and in light of any newly obtained information relevant to Rosa's claim.

---

8. Even in these situations, this Court has permitted the Commissioner to retain the option, under 42 U.S.C. § 405(g), to file a motion before the district court requesting that the matter be remanded for further proceedings before the Commissioner. *See Balsamo,* 142 F.3d at 82. Such a motion may be granted only where the Commissioner has identified new and material evidence, and provided also that the Commissioner can establish "good cause" for having failed to submit that evidence earlier. 42 U.S.C. § 405(g). In a case such as this one, however, in which the primary problem with the decision below is that the ALJ failed adequately to develop the record

before her, it is appropriate for this Court simply to exercise its "power," also under § 405(g), to "remand[] the cause for a rehearing." *Id; see also Almonte v. Apfel,* 1998 WL 150996, *9 (S.D.N.Y. March 31, 1998) ("This is a case where the Court has found that the ALJ failed to develop a sufficient record to determine whether there is substantial evidence to support the denial of the plaintiff's claim of disability. It is not a case where the Commissioner seeks a remand for the consideration of new and material evidence which was omitted from the record for good cause.").