**George T. JEHN, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. 04–CV–05599–ADS.**

United States District Court, E.D. New York.

Jan. 12, 2006.

Binder and Binder, New York City (Charles E. Binder, of Counsel), for the Plaintiff.

Roslynn R. Mauskpof, United States Attorney, by Margaret Ann Donaghy, Special Assistant U.S. Attorney, Brooklyn, NY, for the Defendant.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

George T. Jehn ("Jehn" or the "Plaintiff") commenced this action pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final determination of the Commissioner of Social Security ("Commissioner") denying disability insurance benefits to him. Currently pending before the Court are motions by both parties pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings.

## I.  BACKGROUND

### A.  The Record

#### 1.  The Plaintiff's Background, Medical History, and Testimony

Jehn was born on August 28, 1945, and is presently 60 years of age. He is a college graduate, married, and has three adult children. From 1970 through April 1998, Jehn worked as an airline pilot, and his most recent position was as a co-pilot for U.S. Airways. On April 28, 1998, while traveling as a passenger in an airplane from London to New York he suddenly suffered a grand mal seizure and collapsed. After suffering the seizure, Jehn went to Winthrop University Hospital Emergency Room.

Dr. Bernard Savella, a board certified neurologist, examined Jehn on May 1, 1998, following his first seizure. Jehn was awake, alert, and oriented. His speech, motor, sensory, gait, balance, and coordination functions were normal and the cranial nerves were intact. He noted that Jehn had suffered a grand mal seizure and collapsed while on a plane and that a blood test showed that there was a slightly elevated glucose level but no evidence of hyperglycemia. The initial blood culture results showed no growth after one day. Jehn's EEG and MRI were both normal. Dr. Savella also noted that the seizure was the first such episode Jehn had suffered. In addition, there was no family history of seizures. Dr. Savella's impression was that the seizure was probably caused by a virus or dehydration. As a result, Dr.

Savella did not prescribe any medication to treat the occurrence of the seizure.

After learning of his medical condition, the Federal Aviation Administration (FAA) suspended Jehn's flying license. Following the medical determination that his condition was due to a virus or dehydration, Jehn's license was reinstated. However, in September 1998, while at the airport preparing to return to work, Jehn became confused and could not speak properly. He could not operate a computer. This episode lasted approximately an hour. Following this second episode, the FAA revoked his medical certificate, which is required to be certified to work as a co-pilot.

Jehn continued to suffer episodes, which he sometimes refers to a "seizures," for the next several years. The episodes consisted of confusion and garbled speech, followed by headaches and sometimes fever. Following one episode, on October 19, 1999, Jehn was admitted to NYU Medical Center on complaints of "a seizure disorder." Jehn was admitted to the hospital and prescribed Tegretol, a drug that has been shown to be effective in the treatment of psychomotor and grand mal seizures, as well as trigeminal neuralgia. *Physician's Desk Reference for Prescription Drugs* (Micromedex Inc., 2005). He was also placed on video-EEG monitoring. No seizure activity was noted. Jehn was discharged four days later and diagnosed with partial epilepsy.

### 2. The Treating Neurologist

Dr. Orrin Devinsky, a board certified neurologist, began treating Jehn regularly beginning on August 20, 1999. In his initial examination, Jehn complained of suffering a single tonic-clonic seizure in 1998. A tonic-clonic seizure includes a loss of consciousness and violent movements of the extremities due to electrical discharges

that affect the brain. *Tabers Cyclopedic Medical Dictionary* (F.A. Davis Inc., 2002).

Jehn stated to Dr. Devinsky that when he was 38, he was in a major motor vehicle accident in which he sustained serious head trauma and "clinically died" twice before being revived. After recovering from the accident, he noticed he had a jerk toward the end of writing a sentence, but this was resolved within a couple of days. Jehn also reported an isolated episode where he was unable to speak any words. In addition, he would awake from sleep feeling mentally slow and cloudy for five or ten minutes.

On September 6, 2000, Dr. Devinsky completed a narrative report in which he stated that Jehn was evaluated at NYU Comprehensive Epilepsy Center in October 1999 and was diagnosed with partial epilepsy, which is a disease marked by recurrent seizures due to repetitive abnormal electrical discharges in the brain. *Taber's* p. 694. He reported that Jehn was diagnosed as having partial epilepsy and Tegretol was prescribed. Dr. Devinsky noted that since Jehn started taking Tegretol in September 1999, he has had no further episodes of any type of partial seizure. Dr. Devinsky opined that if Jehn continued on his current doses of medication, he would remain seizure free.

On December 18, 2001, Dr. Devinsky completed a "Seizures Impairment questionnaire" for Jehn. Dr. Devinsky noted that he diagnosed Jehn as having partial epilepsy and opined that it was a chronic condition. In support of these opinions, Dr. Devinsky identified testing to confirm his diagnosis, including the results of the video-EEG monitoring study performed on October 10–23, 1999. These tests were consistent with a diagnosis of partial epilepsy. Also, as a result of the testing, Dr. Devinsky was able to determine that Jehn

had a probable seizure at the beginning of October 2001 marked by confusion, garbled speech and accompanied by a headache. Dr. Devinsky noted that Jehn's last three seizures occurred in "October 2001, October 2001, and September 1999." During his seizures Jehn would lose consciousness, which would last from a few minutes to all day with intermittent episodes of confusion and garbled speech. Dr. Devinsky listed lethargy and confusion as the manifestations of tonic/clonic seizures and headaches as a result of partial seizures.

In the questionnaire, Dr. Devinsky opined that Jehn would have periodic interference with attention and concentration as a result of his symptoms and that an increase in stress, in particular, can decrease his seizure threshold. In addition, the doctor listed the limitations that would affect Jehn's ability to work at a regular job on a sustained basis. The list included the need to avoid fumes, gases, temperature extremes, humidity, dust, and heights.

On November 18, 2002, Dr. Devinsky noted that Jehn reported that he had suffered a seizure episode while exercising. Jehn stated that he was also experiencing mild sleepiness, memory problems, and tremors, but no cognitive problems, blurry vision, or other side effects. Dr. Devinsky instructed him not to drive and increased the dosage of Tegretol to 600 milligrams.

On December 5, 2002, Jehn underwent a comprehensive neuropsychological evaluation by Dr. Devinsky in conjunction with Eric Brown, Ph.D., clinical professor of neurosurgery, and Adam Fried, B.A., neuropsychological extern at NYU–Mt.Sinai. The evaluation included a plethora of psychological tests for intellectual functioning and a video-EEG. The video-EEG monitoring revealed an abnormal awake and sleep EEG consistent with cortical hyper

excitability bilaterally, which suggested partial focal epilepsy.

All of the results of the intellectual tests were within the average range of intellectual functioning and compatible with early right-sided head trauma, which was most likely a result of his automobile accident. He had an average ability for complex visuospatial reasoning and an impaired ability to reproduce a complex geometric design. He had average abilities for visual sequencing, concept formation, set shifting and visual fluency. His language ability was within the average to low average. The testing revealed that Jehn's verbal learning and memory were impaired and he had problems with visual memory and recall that were compatible with left temporal seizure onset, consistent with prior EEG results. The mood testing indicated that Jehn had somewhat low self-confidence and social withdrawal. Jehn complained during the tests that he experienced stress during uncertain job situations.

In two follow-up reports, on February 3, 2003, and August 4, 2003, Dr. Devinsky noted that Jehn reported no seizure activity since the fall of 2002. In addition, Jehn reported no sleepiness, memory problems, cognitive problems, tremors, gait problems, blurry vision, or other problems. Dr. Devinsky's impression remained partial epilepsy.

### 3. The Social Security Administration Consulting Physician

On November 30, 2000, at the request of the Social Security Administration, Dr. Stacy Vitale–Gregorace examined Jehn for neurological evaluation. Dr. Vitale–Gregorace is a board certified neurologist. Dr. Vitale–Gregorace noted that Jehn was diagnosed by Dr. Devinsky as having partial epilepsy and, after taking Tegretol, had been seizure-free for the past 14 months.

Jehn reported that during his seizure, he had difficulty with memory, difficulty speaking and at times felt "spaced out" for several minutes. Dr. Vitale–Gregorace stated that it was difficult to determine the seizure frequency because Jehn had only 4 episodes of seizures in the past two years. Dr. Vitale–Gregorace also noted that Jehn could undertake general activities of daily living such as performing household chores, dressing, bathing, showering, and even driving.

The mental status examination indicated that Jehn's mood and affect were appropriate. He had good eye contact. No delusions or hallucinations were found. He had no memory impairment and no impaired insight or judgment, and his cognition was appropriate. In addition, Jehn's gait and station were normal. His cranial nerves were intact. The range of motion was full for both upper and lower extremities. Jehn's motor activity was normal. He was able to hold a large object, pick up and manipulate a coin, write with a pen, button a button, open a cap and zip a zipper.

Dr. Vitale–Gregorace diagnosed Jehn as having partial epilepsy, but gave him a stable prognosis. The doctor noted that Jehn had no limitations in walking, standing, carrying, lifting, bending, reaching, and sitting. Also, he had fine and gross motor reflexes, but had mild limitations in climbing, using dangerous machinery, operating a motor vehicle, and going into high places.

### 4. State Agency Physical Residual Functional Capacity Assessment

Dr. C.R. Manley, a State Agency Physician, completed an eight-page Physical Residual Functional Capacity Assessment based on the evidence in the record. Dr. Manley opined that Jehn had no exertional limitations in that he was seizure-free and his epilepsy was controlled by medicine, but that he must limit his exposure to operating machinery and avoid heights. Dr. Manley also stated that Jehn did not have postural, manipulative, visual, or communicative limitations.

### 5. The Vocational Expert's Testimony

At the hearing, Dr. David Vandergoot, a vocational expert, testified about the residual functional capacity of the Plaintiff and his ability to obtain substantial employment in the national economy. Dr. Vandergoot opined that the plaintiff's skills as a pilot were not transferable to other jobs because his skills were too specific. He also stated that the plaintiff did not have any significant physical limitations. Dr. Vandergoot concluded that the Plaintiff could work at unskilled, sedentary to light level jobs in clerical work as a collator, in assembly work, and as an inspector in the food or electronics industries.

With regard to these types of jobs, Dr. Vandergoot stated that there are 800,000 general clerical positions, such as collator, office helper, general clerk, addressing clerk, routing clerk and distribution clerk nationally and 80,000 locally. There are 350,000 assembly positions in factory environment that do not require moving machinery nationally and 15,000 locally. Nationally, there are 500,000 inspection positions in a variety of industries and locally there are 30,000 positions.

In addition, the vocational expert testified that if Jehn had a slight reduction in attention and concentration or experienced weakness and lethargy, the impact on his ability to perform clerical and factory jobs would be slight. However, the impact on his ability to perform assembly jobs would be greater than it would be in clerical jobs.

## B. The Procedural History

On August 28, 2000, Jehn filed an application for social security disability insurance benefits, claiming that he was disabled since April 28, 1998 due to epilepsy. After his application was denied twice, initially on December 20, 2000, and again on reconsideration on January 29, 2001, Jehn requested a hearing before an administrative law judge.

On February 5, 2002 a hearing was held before Administrative Law Judge Jerry J. Bassett ("ALJ"). At the hearing, the Plaintiff was represented by an attorney. The ALJ heard testimony from the Plaintiff and Dr. Vandergoot, the vocational expert. In a decision dated February 21, 2002, the ALJ found that Jehn was not disabled and denied his application for social security insurance benefits.

After evaluating the Plaintiff's disability claims in the five-step analysis, the ALJ conceded that Jehn could not perform his past relevant work, but found that he retained the residual functional capacity to perform unskilled work at the sedentary to light levels in the national economy. The ALJ found at step one that the plaintiff has not engaged in substantial gainful activity since April 28, 1998. At step two, the ALJ found that the plaintiff suffered a severe impairment consisting of partial epilepsy. At step three, the ALJ found that the plaintiff did not have an impairment, or combination of impairments, that meets or equals the criteria of any impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ found the plaintiff was unable to return to his prior employment. However, in the final step, the ALJ found that the Plaintiff had the residual functional capacity to perform medium and unskilled work, and possibly even heavy work. However, he must avoid heights, operating machinery and driving. Accordingly, the ALJ concluded that the Plaintiff was not disabled within the meaning of the Social Security Act.

On March 27, 2002, Jehn requested review of the decision by the Appeals Council. On September 30, 2004, the Plaintiff filed additional evidence in support of his application for disability, consisting of a questionnaire completed by Dr. Devinsky and the results of the comprehensive neuropsychological evaluation conducted on December 3–7, 2002. On November 19, 2004, the Appeals Council denied his request for review, and the ALJ's decision became the final determination of the Commissioner. On December 22, 2004, the plaintiff commenced the instant action challenging the determination denying him disability benefits.

## II. DISCUSSION

### A. Standard of Review

In reviewing the decision of the Commissioner, the Court must determine whether: (1) the Commissioner applied the correct legal standard, see *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir.1999); and (2) the decision is supported by substantial evidence, see 42 U.S.C. § 405(g); *Brown v. Apfel*, 174 F.3d 59, 61–62 (2d Cir.1999). Substantial evidence is "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), and requires enough evidence that a reasonable person "might accept as adequate to support a conclusion." *Brown*, 174 F.3d at 62–63.

In determining whether the Commissioner's findings are supported by substantial evidence, the Court's task is "to examine the entire record, including contradictory evidence and evidence from which conflicting interferences can be drawn." *Id.* at 62 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). In addition, the Court is mindful

that "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Commissioner of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.1998). Indeed, in evaluating the evidence, " 'the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon de novo review.' " *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir.1991) (quoting *Valente v. Secretary of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984)).

Federal disability insurance benefits are available to those individuals who are "disabled" within the meaning of the Act. See 42 U.S.C. § 423(a), (d). To qualify for disability benefits under the Act, a plaintiff must establish his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

The Commissioner has promulgated a five-step analysis for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has explained the procedure under the five-step inquiry:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir.1998) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)); *see also Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir.1998), *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir.1998).

Within this framework, the claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden of proof as to the fifth step. *See Schaal*, 134 F.3d at 501 (citing *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir.1996)); *see also* 20 C.F.R. §§ 404.1520, 416.920. Proceeding through the five-step analysis, the Commissioner must consider the complete record, including any objective medical evidence, as well as the claimant's subjective statements concerning her or his impairment, restrictions, daily activities and any other relevant statements. *See Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir.1984). However, and significantly, the Commissioner must accord special evidentiary weight to the opinion of the treating physician. *See Clark*, 143 F.3d at 119.

■ Remand of a disability claim for further administrative procedures is an ap-

propriate remedy where, among other things, (1) "there are gaps in the administrative record or the ALJ has applied an improper legal standard . . .," *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir.1999), or (2) new, material evidence is adduced that was not produced before the agency. *See Raitport v. Callahan*, 183 F.3d 101, 104 (2d Cir.1999) (citation omitted).

## B. Analysis

Based upon the medical and non-medical evidence, and the testimony from the Plaintiff and a vocational expert, the ALJ concluded that despite the severe impairment of partial epilepsy, Jehn could perform sedentary to light, unskilled work, as long as he avoided heights, operating machinery, and driving. The Plaintiff argues that the ALJ did not meet his burden at step five and that the ALJ's analysis was flawed for two reasons. First, the Plaintiff contends that the ALJ did not properly consult the grids, which suggested a finding of disability in Jehn's circumstance. Second, the Plaintiff contends that the hypothetical questions posed to the vocational expert and his responses failed to incorporate or evaluate all of Jehn's impairments in light of his age and work history.

### 1. The use of the Grids in Non-exertional Disability Cases

When evaluating the claimant's residual functional capacity in the fifth step, the ALJ is charged with the task of marshaling the evidence and determining whether there are a significant number of jobs in the national economy that the claimant can perform based on his residual functional capacity, age, education, and prior vocational experience. *See* 20 C.F.R. § 404.1560; *Butts v. Barnhart*, 388 F.3d 377, 381 (2d Cir.2004); (*see also Sims v. Apfel*, 530 U.S. 103, 110, 120 S.Ct. 2080,

147 L.Ed.2d 80 (2000)). "In the ordinary case, the Commissioner meets [the] burden at the fifth step by resorting to the applicable medical vocational guidelines (the grids)." *Rosa*, 168 F.3d at 78 (quotations and citations omitted). However, the grids only account for exertional limitations, that is, those that relate to "strength" requirements of jobs such as the claimant's capacity to sit, stand, walk, lift, carry, push or pull.

Impairments and limitations that do not implicate the strength required to perform a particular task are considered non-exertional. For example, mental, sensory, and skin impairments are considered non-exertional, as well as impairments that cause environmental restrictions. *See* Social Security Ruling 96–8p. When evaluating significant non-exertional impairments that limit the range of sedentary work that the claimant can perform, sole reliance on the grids is inappropriate. Instead, a vocational expert is necessary to assess the claimant's residual functional capacity for meaningful employment opportunities. *See Bapp v. Bowen*, 802 F.2d 601, 605–06 (2d Cir.1986).

While it is true that the grids may be used as a guideline if the exertional limitations listed in the grids are similar to the claimant's non-exertional limitations, the use of the grids is not required. Indeed, relying on the grids "in lieu of testimony from a vocational expert . . ." has been described as "inappropriate" by the Second Circuit. *Rosa*, 168 F.3d at 82. Unlike determining a disability where the claimant has an exertional impairment, "[t]he rules do not direct factual conclusions of disabled or not disabled for individuals with solely nonexertional types of impairments." 20 C.F.R. Pt. 404 App. 2, Grid Rule 200.00(e)(1). "In the evaluation of disability where the individual has solely a nonexertional type of impairment, determi-

nation as to whether disability exists shall be based on the principles in the appropriate sections of the regulations, giving consideration to the rules for specific case situations...." *Id.*

■ Here, the Court finds that the ALJ properly relied on the vocational expert, Dr. Vandergoot, rather than the grids. Although a similar claimant with an exertional or physical limitation would be considered "disabled" under the grids, this alone does not dictate a finding of disability in this nonexertional case. Cases involving nonexertional limitations are inherently different than those involving solely physical limitations because of the impact the disability has on the individual's work capability. Jehn has no strength limitations other than those brought about by his age. At the hearing the testimony concerned only his environmental limitations such as the need to avoid heights, dangers, or moving machinery. In contrast, a similar claimant with a physical disability may have trouble performing sedentary or light work because such work primarily involves the tasks of sitting, standing, or walking, which are activities directly related to a person's strength and physical capacity. Thus, considering the Plaintiff apparently retains a full physical range of activities for his age, it was reasonable to find that he could perform light to sedentary work as long as he avoids the enumerated environmental restrictions and continues his medication.

## 2. The Hypothetical Questions to the Vocational Expert

■ In order to meet his burden at the fifth step, generally the ALJ examines a vocational expert by the use of hypothetical questions. "The ALJ must pose hypothetical questions to the vocational expert which reflect the full extent of the claimant's capabilities and impairments to pro-

vide a sound basis for the [expert]'s testimony." *Sanchez v. Barnhart,* 329 F.Supp.2d 445, 449–50 (S.D.N.Y.2004) (citing *De Leon v. Sec'y of Human Servs.,* 734 F.2d 930, 936 (2d Cir.1984); *Aubeuf v. Schweiker,* 649 F.2d 107, 114 (2d Cir. 1981)). "The vocational expert's testimony is only useful if it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job." *Id.,* 649 F.2d at 114 (2d Cir.1981).

■ In this case, the Plaintiff argues that the hypothetical questions posed to the vocational expert were inadequate because they did not incorporate all of the limitations cited by the treating physician. In particular, the Plaintiff contends that the ALJ should have considered evidence from Dr. Devinsky that is not in the administrative record, but was submitted to the Appeals Council, which indicated that Jehn's symptoms were periodically severe enough to interfere with attention and concentration. Also, additional evidence obtained after the hearing from the comprehensive neuropsychological evaluation at NYU–Mt.Sinai showed that his verbal learning and memory was impaired. Jehn argues that these symptoms should have been incorporated in the hypothetical questioning of the vocational expert.

At the hearing, in the hypothetical questions, the ALJ addressed the Plaintiff's limitations on avoiding driving, climbing, working at heights, and moving or operating dangerous machinery due to the plaintiff's partial epilepsy. Based on the evidence that was before the ALJ at the time of the hearing, it appears that the hypothetical questions adequately reflected the nature and severity of Jehn's disability. However, after the hearing Jehn submitted new and additional evidence to the Appeals Council. The new evidence included a "Seizures Impairment Question-

naire" completed by Dr. Devinsky on December 18, 2001, which was before the hearing but was not included in the administrative record before the ALJ. The questionnaire was submitted to the Appeals Council prior to its decision, but it is not known whether the evidence was considered because it is not included as part of the joint administrative record filed with this Court. In addition, the Plaintiff submitted the results of an evaluation conducted in December 2002 at NYU–Mt.Sinai medical center. It is also unclear from the record whether the Appeals Council considered this evaluation when it decided not to review Jehn's application.

The sixth sentence of 42 U.S.C. § 405(g), states that "[t]he court ... may at any time order additional evidence to be taken before the Secretary, but only upon a showing that there is new evidence which is material and that there is no good cause for the failure to incorporate such evidence into the record in the prior proceeding...." *Id.; see also Shalala v. Schaefer*, 509 U.S. 292, 297, n. 1, 113 S.Ct. 2625, 2629, 125 L.Ed.2d 239 (1993); *Melkonyan v. Sullivan*, 501 U.S. 89, 99–100, n. 2, 111 S.Ct. 2157, 2163–64, n. 2, 115 L.Ed.2d 78 (1991).

The Second Circuit has stated that the inclusion of additional evidence requires a "three-part showing" as follows:

> An appellant must show that the proffered evidence is (1) new and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative. The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently. Finally, claimant must show (3) good cause for her failure to present the evidence earlier.

*Lisa v. Sec'y of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir.1991) (quotations and citations omitted).

The Court finds the evidence submitted to the Appeals Council new, relevant, and probative of Jehn's condition. In the December 2001 questionnaire, Dr. Devinsky listed several limitations other than those on driving, working at heights or moving machinery that would affect the plaintiff's ability to work at a regular job. Dr. Devinsky opined that the Plaintiff needed to avoid fumes, gases, temperature extremes, humidity, and dust. Also, Dr. Devinsky indicated that "all of the above [limitations] can definitely decrease patient's seizure threshold." Further, Dr. Devinsky listed fever and stress which can be associated with work as precipitating factors that may cause a seizure. He also listed lethargy and confusion as the postictal manifestations after tonic/clonic seizures and headaches after partial seizures.

Further, the comprehensive neuropsychological evaluation that Jehn underwent at NYU–Mt.Sinai on December 5, 2002, revealed that his verbal learning and memory were impaired and that he had problems with visual memory and recall. The testing also found that Jehn had low self-confidence and social withdrawal. In addition, Jehn complained during the tests that he experienced stress during uncertain job situations

In posing the hypothetical questions to the vocational expert the ALJ was unable to incorporate any of these symptoms or limitations because the tests and evaluations were taken after the hearing. "A hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony." *Bosmond v. Apfel*, 1998 WL 851508, *8, 1998 U.S. Dist. LEX-

IS 19078, 59 Soc. Sec. Rep. Service 165, at 24 (S.D.N.Y.1998) (citation omitted); *see also De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984). The description of Jehn's disability and his limitations became substantially more detailed after these later evaluations. As a result, the hypothetical questions asked at the hearing did not accurately incorporate the full range of the Plaintiff's limitations and restrictions caused by his partial epilepsy.

The new evidence from the treating physician is relevant to the hypothetical questions posed to the expert in the hearing and may alter the expert and the ALJ's conclusion as to whether Jehn has the ability to perform other work. In addition to being relevant, good cause exists to admit such evidence after the date of the hearing given the nature of Jehn's condition and the types of studies that were performed in order to determine the severity of his partial epilepsy.

Also, although not raised by either party, the Court finds relevant the Plaintiff's advancing age. At the time of the hearing, when the vocational expert testified, the Plaintiff was 57 years old. By the time Appeals Council addressed Jehn's application for disability in November 2004, he was 59 years old. Now that the Plaintiff is 60 years old, with reasonable certainty his age is of greater relevance to the assessment of his residual functional capacity and whether there is other work which the claimant can perform. 20 C.F.R. § 404.1520.

Therefore, the Court remands this case pursuant to the sixth sentence of 42 U.S.C. § 405(g), so that the Commissioner may consider the post-hearing medical evidence and reconsider the issue of whether there is other work that Jehn could perform. After hearing such evidence, "the Secretary must return to the district court to 'file with the court any such additional or modified findings of fact and decision, and a transcript of the additional record and testimony upon which his action in modifying or affirming was based.'" *Melkonyan*, 501 U.S. at 98, 111 S.Ct. at 2163, 115 L.Ed.2d 78 (citing 42 U.S.C. § 405(g)).

## III. CONCLUSION

Having reviewed the submissions of the parties and the findings by the Commissioner, the ALJ, and the Appeals Council, and for the reasons set forth above, it is hereby

**ORDERED,** that the motions by both parties for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, are DENIED; and it is further

**ORDERED,** that the case is remanded to the Commissioner pursuant to the sixth sentence of 42 U.S.C. § 405(g), for further administrative proceedings in accordance with this order; and it is further

**ORDERED,** that the Clerk of the Court is directed to mark this case closed; and it is further

**ORDERED,** that the parties may apply to reopen the case upon the filing of additional or modified findings of fact and a decision vacating, modifying, or affirming the Commissioner's prior decision in this case.

**SO ORDERED.**