**Joseph Vincent BATALL, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security[1], Defendant.**

**No. 97–CV–6474L.**

United States District Court, W.D. New York.

April 9, 1999.

---

1. Responsibility for Social Security cases has been transferred from the Secretary of Health and Human Services to the Commissioner of Social Security effective March 31, 1995. *See* Social Security Independence and Program Improvement Act of 1994, Pub.L. No. 103–296, § 105, 108 Stat. 1464, 1472 (1994) (codified at 42 U.S.C. § 901 note). In accordance with the Social Security Independence and Program Improvement Act, section 106(d), and Rule 25(d)(1), the Commissioner of Social Security is hereby substituted for the Secretary of Health and Human Services. *See* Pub.L. No. 103–296, § 106(d), 108 Stat. at 1476–77 (1994) (codified at 42 U.S.C. § 901 note); Fed.R.Civ.P. 25(d)(1).

Joseph Vincent Batall, Rochester, NY, pro se.

Anne VanGraafeiland, Asst. U.S. Atty., Rochester, NY, for Secretary Dept. HHS, defendant.

## DECISION AND ORDER

LARIMER, Chief Judge.

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final deter-mination of the Commissioner of the Social Security Administration that plaintiff was not disabled prior to his established onset-of-disability date and, thus, was not enti-tled to additional benefits. I find that the Commissioner's decision is supported by substantial evidence and, therefore, I grant the Commissioner's motion for judg-ment on the pleadings and dismiss the complaint with prejudice.

## PROCEDURAL BACKGROUND

On October 16, 1995, plaintiff Joseph Vincent Batall ("Batall") filed a claim for disability insurance benefits alleging that he was disabled beginning July 1, 1995. (T. 55).[2] Plaintiff's claim for disability due solely to HIV infection was initially denied by the Commissioner. (T. 67). Plaintiff then filed a request for reconsideration. (T. 71). The Commissioner subsequently allowed plaintiff's claim for disability due to HIV infection and depression as of Jan-uary 1, 1996. (T. 86). Plaintiff filed a request for a hearing seeking additional benefits, alleging that he was disabled as of "the early summer of 1995." (T. 88). Following plaintiff's *pro se* appearance be-fore an Administrative Law Judge ("ALJ"), the ALJ determined that "prior to January 1, 1996, the claimant did have a severe impairment or combination of im-pairments but retained the residual func-tional capacity to return to the work he performed in the past." (T. 9). Plaintiff's request for additional benefits was denied. (T. 9–10). The Appeals Council affirmed the ALJ's decision on October 4, 1997. (T. 2).

On October 20, 1997, plaintiff filed a complaint with this Court seeking review of the Commissioner's decision. Although plaintiff originally sought disability bene-fits beginning July 1, 1995, plaintiff alleged in his complaint that his disability began

---

**2.** "T.____" refers to the page of the transcript of the administrative record filed by the Com-missioner with his answer.

on September 1, 1995. The Commissioner filed a motion for judgment on the pleadings on June 3, 1997. Plaintiff, acting *pro se*, filed no response.

## FACTUAL BACKGROUND

Plaintiff was born on April 2, 1936. (T. 29). He has a four-year accounting degree, with two years of course work in financial management, and has worked as a collection manager, a credit manager, and an accounts manager. (T. 31, 33–34). Plaintiff was diagnosed with HIV in November 1989. (T. 97). The record indicates that in November 1994, plaintiff was laid off from his last position as a credit manager for reasons unrelated to his illness. (T. 97,162). He received unemployment insurance from the State of Missouri from November 1994 until April 1995. (T. 32). The record reveals that plaintiff had a driver's license and owned a car. (T. 30). He also performed some household chores, including shopping for groceries, cooking, and light housework. (T. 113–15). At the hearing, plaintiff complained of extreme fatigue, vomiting, frequent nocturnal urination, and numbness in his left arm and hand. (T. 37–39).

The record contains reports documenting plaintiff's medical visits to Wolfe B. Gerecht, M.D., plaintiff's former doctor in Missouri. The first of these reports, dated April 22, 1993, indicates that plaintiff is suffering from "[a]symptomatic HIV disease." (T. 125–126). A July 21, 1993 report indicates that plaintiff has "no symptomatology whatsoever." (T. 126). Dr. Gerecht noted that plaintiff "has still not been able to find a job and he is feeling depressed over this." *Id.* Dr. Gerecht continued to report no HIV symptoms through August 16, 1994.[3] (T. 127–30). In his report of September 15, 1994, Dr. Gerecht indicated that plaintiff had begun AZT therapy.[4] (T. 131). Dr. Gerecht described plaintiff as still asymptomatic, noting that "he has been feeling good," and "[t]he only thing he noticed is that he goes to the bathroom a little more at night and he feels slightly tired." *Id.* On October 20, 1994, plaintiff was still asymptomatic, but he continued to complain of insomnia due to nocturnal urination. (T. 131–32). Following an examination on December 20, 1994, Dr. Gerecht indicated that plaintiff reported no side effects or new complaints. (T. 132–33). On February 7, 1995, plaintiff again complained of no new symptoms and indicated that he had no nausea, vomiting, or diarrhea. (T. 133–34). Plaintiff did test positive for syphilis, and received treatment. (T. 133–36). On June 28, 1995, Dr. Gerecht noted that plaintiff was

---

**3.** Dr. Greeter's notes following a visit on November 17, 1993, contain a significant typographical error. Under "History of Present Illness" his notes read: "Has had no complaints, has no symptoms related to his HIV whatsoever. He has had fever, chills, sweats, night sweats, change in appetite. Change in appetite. His weight is down but he thinks it is due to the stress related to his job." (T. 127). After noting that plaintiff has had no complaints or HIV symptoms, the fact that the subsequent sentence indicates fever, chills, sweats, and a change in appetite seems incongruous. The record of plaintiff's next examination on March 16, 1994, also indicates that plaintiff has no HIV symptoms. There is no mention of fever, chills, sweats, or night sweats. (T. 128). If these conditions existed on November 17, 1993, it seems likely that Dr. Gerecht would mention these symptoms again, or at least note that these symptoms had disappeared. Other entries in Dr.

Greeter's notes list the absence of fever, chills, or sweats following a notation that plaintiff has been doing well, has no complaints, or has "no specific localizing symptoms." (T. 123, 134, 138).

The content of the November 17, 1993 report, as well as notations in subsequent reports that plaintiff complained of no fever, chills, or sweats, indicate that the November 17, 1993 report should read: "He has had [no] fever, chills, sweats, night sweats, change in appetite."

**4.** The record also indicates two prescriptions for Retrovir on September 5, 1995, and January 4, 1996. (Tr. 123, 137) "Retrovir is a brand name for zidovudine (formerly called azidothymidine [AZT]), a pyrimidine nucleoside analogue active against human immunodeficiency virus (HIV)." Physician's Desk Reference 1167 (52d ed.1998).

"feeling well" and that he had "no complaints" save "a little tiredness ... [that] ... comes and goes." (T. 136). On September 25, 1995, plaintiff continued to complain of fatigue, indicating that he slept twelve hours a night and napped during the day. (T. 138). Plaintiff described no other symptoms and denied any fever, chills, sweats or night sweats, nausea, vomiting, abdominal pain, or diarrhea. (T. 138). Dr. Greeter's final report, dated January 25, 1996, again notes fatigue as a major complaint and indicates that plaintiff denied any "fever, chills, sweats, nausea, vomiting, and diarrhea." (T. 123–24). The medical records indicate no significant change in plaintiff's weight. The record also indicates that in August 1994, plaintiff's helper/inducer T-cell count ("CD–4") dropped to 354. (T. 152). Following AZT therapy, plaintiff's CD–4 count was 452 in January 1996. (T. 140).

Plaintiff also submitted a letter from Thomas Evans, M.D., his present physician in Rochester, New York. Dr. Evans indicated that for the last four months he had been treating plaintiff for his "relatively moderate HIV disease as well as fairly severe depression." (T. 167). The letter notes, "[i]t should be known that Dr. Gerecht felt that Mr. Batall's disability secondary to combination of his HIV and depression began in July of 1995." *Id.* Plaintiff submitted a letter from Dr. Gerecht, dated August 8, 1997, with his complaint. The letter is dated after the ALJ's decision was issued, and is not part of the administrative record. The substance of the letter states:

> I reviewed your chart and believe that I can state that you were disabled based upon review of my records as of September 1, 1995. In review of my records your symptoms of increasing fatigue, tiredness [sic] which became virtually disabling were clearly present by Sep-

tember 1, 1995 and I believe that you were totally disabled after that date.

## DISCUSSION

### A. Standard of Review

▉ The issue before this Court is whether the Commissioner's decision that plaintiff was not under a disability from July 1, 1995, to December 31, 1995, is supported by substantial evidence.[5] *See* 42 U.S.C. § 405(g); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. National Labor Relations Bd.,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Thus, the Commissioner's determination will be upheld as long as it is supported by substantial evidence and is not based on legal error. *Arnone v. Bowen,* 882 F.2d 34, 37 (2d Cir.1989) (citations omitted).

### B. The Standard for Finding a Disability

A person is considered disabled when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A).

---

5. Plaintiff, however, has alleged in his complaint that he was disabled as of September 1, 1995.

■ In order to determine whether a claimant is disabled, an ALJ employs a five-step inquiry:

> The first step determines whether the claimant is engaged in "substantial gainful activity." If he is, benefits are denied. If he is not engaged in such activity, the process moves to the second step, which decides whether the claimant's condition or impairment is "severe"—i.e., one that significantly limits his physical or mental ability to do basic work activities. If the impairment is not severe, benefits are denied. If the impairment is severe, the third step determines whether the claimant's impairments meet or equal those set forth in the "Listing of Impairments" ... contained in subpart P, appendix 1, of the regulations.... If the claimant's impairments are not listed, the process moves to the fourth step, which assesses the individual's "residual functional capacity" (RFC); this assessment measures the claimant's capacity to engage in basic work activities. If the claimant's RFC permits him to perform his prior work, benefits are denied. If the claimant is not capable of doing his past work, a decision is made under the fifth and final step whether, in light of his RFC, age, education, and work experience, he has the capacity to perform other work. If he does not, benefits are awarded.

*Bowen v. City of New York*, 476 U.S. 467, 470–71, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986) (citations omitted) (explaining the process adopted by the Secretary for determining eligibility for the Supplemental Security Income Program and Social Security Disability Insurance Program). Once a claimant has proven steps one through four, the burden then shifts to the Commissioner to show that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *See Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999) (quoting *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986)).

## C. The Findings of the ALJ are Supported by Substantial Evidence

■ In this case, the ALJ determined that plaintiff "retained the residual functional capacity to return to the work he performed in the past." Essentially, the ALJ determined that plaintiff failed the fourth prong of the five-step test. The Social Security Regulations define residual functional capacity as follows: "Your impairments(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is what you can still do despite your limitations." 20 C.F.R. § 416.945(a).

In reaching this conclusion, the ALJ observed that the medical reports of Dr. Gerecht revealed little support for plaintiff's complaints of severe fatigue, vomiting, numbness of the left arm and hand, and depression before January 1, 1996. (T. 11–12). The ALJ noted that although plaintiff complained of nocturnal urinary frequency, and that such claims were noted in the medical record, no protective garments were used. (T. 12).

The ALJ also refused to credit plaintiff's statements concerning the effects of his disability on his ability to work. Plaintiff's statements were not considered "credible in light of the claimant's own description of his activities and life style, the medical history, discrepancies between the claimant's assertions and the information contained in the documentary reports, and the claimant's assertions concerning his ability to work." (T. 12). The ALJ found that plaintiff's "description of pain and limitation was exaggerated and inconsistent, and was disproportionate to the objective medical findings." (T. 12).

Although the record supported a finding that plaintiff could not lift more than ten pounds, the ALJ found that plaintiff's former jobs required no such lifting. "Because [plaintiff's] past work did not require the performance of work activities precluded by his medically determinable impair-

ment, prior to January 1, 1996, he was able to return to the type of work he performed in the past." (T. 13).

Based on this Court's evaluation of the record, it is clear that the ALJ's decision is supported by substantial evidence. The record indicates that plaintiff was considered disabled as of January 1, 1996, based on a combination of HIV and depression. As the ALJ noted, there was no record of treatment for depression until after January 1, 1996.[6] (T. 10, 40) The treating physician did indicate on July 21, 1993, that plaintiff was feeling "depressed" over his inability to find employment. (T. 126). However, the record indicates that plaintiff began receiving unemployment insurance payments in November of 1994, following a layoff for reasons unrelated to his illness. (T. ",162). These facts, coupled with the lack of treatment for depression until after January 1, 1996, support the ALJ's finding that plaintiff was not suffering from depression prior to his onset-of-disability date.

 Plaintiff also submitted new evidence in the form of Dr. Greeter's August 8, 1997 letter, which suggested that plaintiff was disabled after September 1, 1995. The Social Security Act provides that a court may remand a case to the Commissioner to consider additional evidence, "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). The Second Circuit has further refined this standard, holding that an appellant must show that the proffered evidence is:

> (1) " 'new' and not merely cumulative of what is already in the record"; and that it is (2) material, that is, both relevant to

the claimant's condition during the time period for which benefits were denied and probative; . . . [and] claimant must show (3) good cause for [the] failure to present the evidence earlier.

*Jones v. Sullivan,* 949 F.2d 57, 60 (2d Cir.1991) (citations omitted). In this case, even assuming that Dr. Greeter's letter is new and material, plaintiff has made no attempt to show why a letter like this could not have been presented below. In any event, Dr. Greeter's letter is contrary to the medical evidence. There was no contemporaneous opinion by Dr. Gerecht to that effect and the clinical notes of his treatment of Batall do not suggest total disability. In sum, the record evidence belies Dr. Greeter's belated opinion on the matter.

Finally, the ALJ evaluated plaintiff's statements concerning the effects of his symptoms on his ability to work. The ALJ determined that, based on all the evidence contained in the record, these statements were not credible. As such, this Court will not disturb this determination.

## CONCLUSION

The Commissioner's decision is supported by substantial evidence and, therefore, the Commissioner's motion for judgment on the pleadings (Dkt.# 9) is hereby granted. The complaint is dismissed with prejudice.

IT IS SO ORDERED.

6. Psychologist Eva Wilson performed a psychological evaluation of plaintiff on March 14, 1996, as part of the Agency's review of his claim. (T. 161). In her evaluation, she noted that plaintiff was taking the drugs Doxepin and Zoloft to aid with his depressive symptomatology. (T. 162). Plaintiff described Doxepin as a sleeping pill, indicating that he took one pill before bed. (T. 113) Dr. Greeter's notes contain no mention of the drug Zoloft. His October 20, 1994; December 20, 1994; January 27, 1995; and February 7, 1995 notes do mention Doxepin, although it is unclear if he actually wrote a prescription on those dates. (T. 131–33).