**Joseph TETA, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendants.**

**No. 02–CV–6414 (ADS)(ETB).**

United States District Court, E.D. New York.

Feb. 27, 2004.

Katz & Stanton by Jack Stanton, Esq., Westbury, NY, for the Plaintiff.

Roslyn R. Mauskopf, United States Attorney, Eastern District of New York by Charles P. Kelly, Assistant United States Attorney, Islip, NY, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Joseph Teta ("Teta" or the "plaintiff") commenced this action pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final determination of the Commissioner of Social Security (the "Commissioner") denying disability benefits to him. Both parties move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. ("Fed. R. Civ.P.").

## I. BACKGROUND

### A. Procedural History

On May 28, 1999 Teta filed an application for social security disability insurance benefits, alleging an inability to work since November 23, 1998. After his application was denied initially and on reconsideration, he requested a hearing before an administrative law judge. On January 10, 2000, a hearing was held before Administrative Law Judge Sy Raynor (the "ALJ"). At the hearing, the plaintiff was represented by an attorney. In a decision dated January 28, 2000, the ALJ found that Teta was not disabled within the meaning of the Act and was therefore not entitled to disability insurance. Subsequently, Teta filed a request for review with the Appeals Council. On October 11, 2002, the Appeals Council declined to review the claim, making the ALJ's decision the final administrative determination. This appeal followed.

On January 11, 2001, the plaintiff filed a subsequent application for disability benefits. This application alleged an onset date of January 29, 2000, the day after the ALJ denied the above mentioned application by the plaintiff. This subsequent application was granted on September 1, 2001.

### 1. Teta's Testimony at the Hearing

At the January 10, 2000 hearing, the plaintiff indicated that he was born on March 17, 1955, making him 41 years of

age at the time of the administrative hearing. The plaintiff is about 6' 1" and weighs approximately 250 pounds. Teta is a high school graduate.

The plaintiff testified that from 1976 to 1986, he worked as a stock person in a supermarket where he was required to load and unload trucks and stock shelves. This occupation required the plaintiff to stand and walk eight hours a day with no sitting. He was also required to lift fifty pounds on a regular basis. Following that job, from May, 1986 until November, 1998, Teta worked in the construction business as an asphalt paver/laborer. There, he was responsible for shoveling asphalt, digging ditches and was required to stand all day and lift and carry objects between fifty and one hundred pounds. This job also involved constant bending.

The plaintiff further testified that on November 23, 1998, he injured his back while shoveling at work. Immediately thereafter, Teta had difficulty walking and had swelling in his leg. The plaintiff was initially treated at the hospital with medication and epidural injections. On January 13, 1999, the plaintiff underwent back surgery.

Teta also stated that his orthopedic surgeon, Dr. Vincent J. Leone ("Dr.Leone"), treated him about every eight weeks. Teta also participated in physical therapy which caused him to feel, "a litter bit better." However, three to four months prior to the January 10, 2000 hearing, he reached a plateau in his physical therapy and continued to experience low back and bilateral leg pain. He also reported that unless he consciously lifted his heel first, his foot dragged while walking. Teta testified that by the end of February, 1999, he was able to walk independently without a walker.

At time of the hearing, the plaintiff indicated that he had constant numbness and tingling in his right foot which becomes painful when walking more than four or five blocks.

With regard to his personal activities, Teta testified that he dresses his three year old son, prepares breakfast for his son and six year old daughter, drives the children to and from school, does light household shopping, makes his own bed, bathes and showers himself, eats at restaurants with friends and drives to the barber. The plaintiff also stated that he could walk four or five blocks, sit between twenty and twenty five minutes at one time, and lift between ten to fifteen pounds but had not tried lifting his three year old daughter.

The plaintiff's June 22, 1999 written statement, indicated that his current activities were walking, socializing, watching television, reading and driving locally which includes driving to physical therapy three times per week but he did not do household chores. The plaintiff claimed that his medication failed to relieve his pain and that the pain rendered him unable to work, walk, sit or stand for any length of time.

### 2. The Treating Physicians
#### a. Dr. Vincent J. Leone

Beginning in June, 1997, the plaintiff was treated by Dr. Leone for lumbar spinal stenosis. From that time until the plaintiff's injury on November 23, 1998, the plaintiff received epidural injections, physical therapy and medication.

On November 25, 1998, two days after the plaintiff's injury, he was treated by Dr. Leone. At that time, the plaintiff complained of sharp mid and low back pain which radiated into his buttocks and thighs. The plaintiff also complained of occasional numbness and tingling in his right toes. Dr. Leone's records indicate

that the plaintiff had a limited range of flexion, extension, rotation and lateral tilting but that motor strength, sensation and reflexes were intact and he made a diagnosis of a lumbar herniated disc with radiculpathy. He advised the plaintiff to continue taking pain medication. Dr. Leone reported that the plaintiff was totally disabled and should remain out of work until further notice. Dr. Leone further requested Workers' Compensation authorization for physical therapy and a lumbar spine MRI.

On November 30, 1998, the plaintiff called Dr. Leone and complained of back and leg symptoms. During the telephone conversation, Teta stated that his medication was helping. Because the plaintiff did not have any new neurological symptoms at that time Dr. Leone believed that an emergency admission was not justified. Dr. Leone instructed the plaintiff to return for treatment as previously scheduled.

On December 31, 1998, the plaintiff returned to Dr. Leone complaining of increasing back pain radiating down his right leg of approximately two weeks duration. The plaintiff was unable to dorsiflex his right toe or foot and had a drop foot with significant edema. Dr. Leone diagnosed acute drop foot, ruled out a herniated disc and prescribed steroid medication.

On January 1, 1999, the plaintiff was admitted to North Shore University Hospital at Glen Cove (the "Hospital") on an emergency basis. Upon admission, he had back pain and difficulty moving his right foot in dorsiflexion with some swelling. The plaintiff was noted to have a history of herniated nucleus pulposis and spinal stenosis since 1997 with an exacerbation on November 23, 1998, which was the date of his injury.

On January 13, 1999, Dr. Leone performed a complete lumbar bilateral laminectomy at L4 with foramintomy and facetectomies at L3 through L5 at the Hospital. Teta remained in the hospital until January 28, 1999. His discharge diagnoses were herniated nucleus pulposus and spinal stenosis, with neuropathy down the right leg and a right foot drop. Dr. Leone advised the plaintiff to avoid heavy lifting.

On February 10, 1999, Dr. Leone reported that, although the plaintiff continued to have a right foot drop in terms of weakness, he had some return of neurological functioning to the foot. Dr. Leone noted that the plaintiff had a well-healed midline surgical scar and was otherwise neurogically intact with good range of motion to the lumbar spine. Dr. Leone diagnosed lumbar herniated disc and stenosis with a foot drop requiring urgent decompression. He prescribed Vicodin and sought authorization for physical therapy and an MRI. He opined that the plaintiff was "totally disabled."

On March 24, 1999, the plaintiff returned to Dr. Leone for a follow up visit. He continued to have a slight drop foot but was able to dorsiflex against resistance. Dr. Leone indicated that there was some tenderness to palpitation, but no severe spasms in his back. Dr. Leone noted that the plaintiff had difficulty with a "slapping" of his foot while walking. Dr. Leone prescribed aquatic and physical therapy in addition to Vicodin. From March 31, 1999 to June 16, 1999, Teta engaged in regular physical therapy.

On March 3, 1999, Dr. Leone discharged the plaintiff from aquatic therapy because the plaintiff's symptoms had "greatly improved" and he demonstrated increased trunk mobility, flexibility and leg strength.

On May 12, 1999, Dr. Leone reported that the plaintiff's symptoms had further improved but he still had right leg spasms.

On May 19, 1999, Dr. Leone's records indicate that the plaintiff was "doing well"

status post lumbar decompressive laminectomy. Although the plaintiff's drop foot had resolved to the point where he had some residual weakness, he was able to walk. Dr. Leone recommended continued physical therapy and again opined that the plaintiff was totally disabled.

On September 22, 1999, Dr. Leone reported that the plaintiff continued to have difficulty with back pain and weakness of the foot and believed that the plaintiff had plateaued in physical therapy. Dr. Leone considered the plaintiff to be totally disabled regarding heavy-duty work and prescribed three more weeks of physical therapy.

On November 17, 1999, the plaintiff returned to Dr. Leone with continued complaints of back pain radiating down his leg with weakness and a drop foot of the right lower extremity. Dr. Leone opined that the plaintiff was totally disabled and prescribed physical therapy. Dr. Leone also indicated that he would try to obtain authorization for the patient for job retraining.

On December 28, 1999, Dr. Leone completed a residual functional capacity questionnaire which covered the time period since November 25, 1998. Dr. Leone indicated that the plaintiff had an abnormal gait, sensory loss, reflex changes, tenderness, swelling, muscle spasm, muscle atrophy and muscle weakness. MRI studies were positive and an EMG was positive for nerve damage in the right leg. The plaintiff's impairments were reasonably consistent with his symptoms and limitations and that his symptoms were constantly severe enough to interfere with attention and concentration. The plaintiff had a poor prognosis for full recovery.

Dr. Leone further opined that the plaintiff could walk only one block without rest, sit continuously for thirty minutes, stand continuously for ten minutes, for less than two hours a day, and lift ten pounds occasionally and less than ten pounds frequently. In Dr. Leone's view, the plaintiff would have to take unscheduled breaks during an eight hour work day and had to use a cane or other assistive device while engaged in occasional standing or walking. Teta could occasionally reach, feel and handle, but could not bend, stoop, crawl, push, pull, climb, kneel or squat.

On March 8, 2000, after the ALJ had already denied the plaintiff's claim, Dr. Leone submitted a letter to clarify his opinion regarding the plaintiff's medical condition and specifically address the decision of the ALJ. Pursuant to an October 11, 2002 Order of the Appeals Council, this letter was made a part of the record. Dr. Leone reported that the plaintiff's back pain and leg symptoms exacerbated in November, 1998 and that Teta's back problems became so severe that in December, 1998, the plaintiff began experiencing neurological difficulties in his right leg.

Dr. Leone further indicated that he reported to an emergency call on January 1, 1999 that the plaintiff was unable to move his right foot. The plaintiff was admitted to the Hospital where testing was performed and there was a neurological consultation with an EMG showing nerve damage to the foot originating in his back. The plaintiff underwent a surgical procedure to decompress the nerves in his back which were causing nerve damage to the foot. Dr. Leone concluded that the plaintiff's foot function was not normal and that he had permanent nerve damage limiting his ability to walk more than fifteen minutes.

Dr. Leone opined that although the plaintiff reached a plateau in physical therapy, he sustained a permanent injury to the nerves and might never regain normal foot functioning again. Dr. Leone also

indicated that if the plaintiff walked for more than fifteen minutes he could fall due to permanent nerve damage documented by EMG testing performed during the plaintiff's hospitalization. Dr. Leone further noted that Teta could not sit for more than four hours because any type of position without a break would kink the blood supply to the spinal cord and place his nerves at further risk for damage and that the limitations he placed on the plaintiff's ability to sit and walk were "generous." Dr. Leone did not believe that the plaintiff would be able to sustain two hours of standing or walking without significant interruptions and breaks.

### b. Dr. Dennis E. Wolf

On December 29, 1998, Dr. Dennis E. Wolf ("Dr.Wolf"), an anesthesia pain management specialist, examined the plaintiff at Dr. Leone's request. Dr. Wolf reported the plaintiff to be somewhat obese, walked with a walker and was in mild to moderate distress with pain. Dr. Wolf noted a history of a prior back injury in March, 1997 which was treated with a series of three epidural injections which allowed him to return to work. The plaintiff continued to work until he was injured on November 23, 1998. The plaintiff complained of weakness and numbness in his right leg and feet with swelling of both ankles. The plaintiff's pain worsened at night which interfered with his ability to sleep and it was "rare" when he was not in pain.

Dr. Wolf noted that the plaintiff had no tenderness of the spinous processes, paravertebral muscles, or sacroiliac joints. The plaintiff was unable to dorsiflex his right foot. Right ankle and knee jerks were absent and were two plus on the left ankle. Knee extension was four plus on the right and five on the left. Knee and plantar flexion were normal. The straight leg raising test was performed to seventy degrees and the plaintiff had one to two plus pitting edema in his ankles.

Dr. Wolf reviewed the MRI and diagnosed the plaintiff with lumbar somewhat complicated radiculopahy with the recent onset of weakness and footdrop in the right leg to be of increased concern. Dr. Wolf prescribed Pamelor and discussed the possibility of epidural steroid injections.

### c. Dr. Divack

Dr. Divack, an internist, treated the plaintiff on December 31, 1998. Dr. Divack opined that the plaintiff had poorly controlled diabetes mellitus. Dr. Divack opined that the plaintiff had not taken Glucophage for five months, had peripheral edema and erythma in his extremities which was indicative of acute gouty arthritis. Dr. Divack prescribed Glucophage and Lasix and advised the plaintiff to elevate his extremities and to follow a strict diet.

On February 11, 1999, Dr. Divack made a diagnoses of diabetes mellitus, hypertension and high cholesterol. On March 18, 1999, the plaintiff returned for a follow up visit.

On April 29, 1999, Dr. Divack recorded the plaintiff's blood pressure to be 110/70 and glucose reading was 83. Dr. Divack opined that the plaintiff had an "excellent" response to the treatment plan.

On August 26, 1999, Dr. Divack reported that there had been no change in the plaintiff's blood pressure or diabetes.

### d. Dr. Vitale

On January 6, 1999, Dr. Vitale, a neurologist, examined the plaintiff at Dr. Leone's request in anticipation of surgery. Physical examination revealed one plus edema of the dorsum of the right foot and right ankle with moderate right foot drop. There was diminished vibratory sensation in both feet which is consistent with neuro-

pathy. Dr. Vitale diagnosed (1) chronic low back syndrome with right foot drop (2) peripheral neuropathy of both feet secondary to diabetes mellitus, and (3) mild to moderate tibial vessel occlusive disease. Dr. Vitale concluded that the plaintiff's symptoms appeared to be predominately radicular and secondary to disc disease, but he ordered studies to rule out an arterial problem. A sonogram performed on January 7, 1999 showed no evidence of deep vein thrombosis.

### e. Dr. Bruce P. Meinhard

From November, 1997 through January 1998, Dr. Bruce P. Meinhard, an orthopedic surgeon, treated the plaintiff for right foot pain. Dr. Meinhard diagnosed possible degenerative joint disease of the subtalar joint which was confirmed by an MRI. Dr. Meinhard prescribed Voltaren.

### 3. The Consulting Physicians
### a. Dr. J. Wright Barry

On March 30, 1999, after his surgery, the plaintiff was seen by Dr. J. Wright Barry ("Dr.Barry"), an internist, at the request of the Social Security Administration. Dr. Barry obtained a history of back pain, drop foot, diabetes mellitus, and hypertension and noted that the plaintiff was a well-developed, well-nourished male who walked with a normal gait and appeared to be in no distress on ordinary movements. The plaintiff indicated that although the surgery improved his pain and functioning, he still suffered from lower back pain radiating to both lower extremities with numbness, tingling, and weakness of the right foot. Dr. Barry's findings were normal except for pain in the hamstrings.

Dr. Barry further noted a well-healed recent laminectomy scar in the lumbar area and forward flexion of the spine was limited to sixty degrees. The plaintiff had slightly diminished dorsiflexion of the right foot. Dr. Barry diagnosed status post lumbar laminectomy for multiple herniated discs and opined that the plaintiff could not perform work requiring strenuous exertion, active bending or heavy lifting and that the plaintiff could further improve with physical therapy. Dr. Barry recommended an orthopedic evaluation.

### b. Dr. C. Ladopoulous

On July 14, 1999, a Department of Social Services ("DSS") medical examiner, performed a functional capacity assessment. Dr. Ladopoulous indicated that the plaintiff was capable of frequently lifting ten pounds and occasionally lifting twenty pounds, can sit for about six hours in an eight hour day and stand and/or walk for about six hours a day and had an unlimited ability to push and pull. In support of this assessment, Dr. Ladopoulous indicated that the plaintiff was status post laminectomy for multiple herniations except for slightly diminished dorsiflexion. Dr. Ladopoulous referred to the report of Dr. Barry and indicated that he reviewed the treating physician's functional capacity assessment. Dr. Ladopoulous concluded that the plaintiff retained the residual functional capacity to engage in light work. A Dr. McDermott subsequently affirmed this assessment.

### 4. The Diagnostic Tests

An MRI performed on June 10, 1998 showed severe spinal canal stenosis at L3–4 and a mild to moderate sized central herniated disc and moderate facet arthritis.

A December 11, 1998 magnetic resonance test ("MRI") taken of the lumbar spine revealed (1) moderate spinal stenosis at L2–3 due to facet hypertrophy superimposed on a congenitally small canal, (2) severe spinal stenosis at L3–4, a mild to moderate sized central herniated disc and moderate facet arthritis superimposed on

the narrow canal, (3) moderate to marked spinal stenosis at L4–5, with marked left sided recess and foraminal encroachment, left posterolateral osteophyte formation and facet arthritis superimposed on the narrow canal, and (4) moderate bilateral recess stenosis at L5–S1 due to reversed spondylolostheseis, posterior osteophyte formation and facet arthritis.

A January 4, 1999 MRI revealed (1) a mildly narrowed spinal canal with spinal stenosis at L3–4 due to a small disc bulge and hypertrophy; (2) osteophyte formation and hypertrophy at L4–5 resulting in an impression on the ventral thecal sac, with spinal canal narrowing and narrowing of the left neuroforamen; and (3) and a moderate to large sized disc bulge/herniation at L5 S1, with narrowing of the spinal canal and neuroforamina.

## B. The ALJ's Findings

The ALJ denied Teta's May 28, 1999 disability claim. The ALJ opined, based on all the evidence that Teta was severely impaired by lumbar stenosis with a right foot drop, status post surgery precluding the plaintiff from performing his previous work which was heavy in terms of exertional demands. The ALJ further concluded that Teta was not disabled under the Act because the plaintiff retained the residual functional capacity compatible with the performance of light work. Such light work, during the course of an eight hour workday, entails standing/walking for up to six hours and lifting up to twenty pounds occasionally. Thus, the ALJ determined that the plaintiff was not disabled under the Act.

The ALJ noted that the plaintiff's diabetes mellitus and high blood pressure were under control and there were no functional restrictions precluding work activity.

The ALJ concluded that the opinions of treating physician Dr. Leone and consult-ing physician Dr. J. Wright Barry supported the ALJ's conclusion that the plaintiff can perform light work. In particular, the ALJ indicated that based upon Dr. Leone's September 22, 1999 record which characterized Teta as disabled regarding only heavy duty work and Dr. Leone's November 17, 1999 recommendation that plaintiff undergo job retraining, it was "implicit ... that the [plaintiff] retained the ability to perform less exertionally taxing work."

Moreover, the ALJ stated that because, Dr. Barry, among other things, indicated that the plaintiff was incapable of work requiring strenuous exertion, active bending or heavy lifting, "in essence Dr. Barry furnished a profile consistent with light work." The ALJ indicated that Dr. Barry's opinion was given "some weight" because in his view, it was consistent with the clinical and diagnostic evidence in the record.

The ALJ also believed there to be inconsistencies in Dr. Leone's records. In particular, the ALJ found that Dr. Leone's November 17, 1999 recommendation that the plaintiff undergo job retraining was inconsistent with his answers on the subsequent December 28, 1999 residual functional capacity questionnaire which stated that the plaintiff had sensory loss, abnormal gait, spasm and muscle weakness and that the claimant could sit less than four hours, stand/walk less than two hours and lift/carry ten pounds occasionally. In the ALJ's view, because Dr. Leone failed to explain Teta's apparent decrease in work function since November 17, 1999, the ALJ's above mentioned conclusion that the plaintiff can perform less "exertionally taxing work" was given "greater weight" by the ALJ.

The ALJ also noted that the DSS medical examiner Dr. Ladopoulous, who did not

actually examine the plaintiff but rather reviewed the file, also concluded that the plaintiff retained the ability to do light work. The ALJ gave Dr. Ladopoulous' opinion "some weight" because "it [was] consistent with the clinical and diagnostic record as a whole."

The ALJ also opined that Teta's subjective symptomatology was unsubstantiated by the medical evidence and could not be characterized as debilitating. Furthermore, the ALJ opined that the plaintiff's daily activities do not comport with a finding of complete disability. The ALJ also noted that the claimant's workers compensation award was reduced based on medical improvement.

The ALJ acknowledged that the claimant's lumbar stenosis status post surgery constituted a severe impairment because it limited his ability to perform some work related activities. Because the plaintiff established an inability to perform his past relevant work, the burden shifted to the Commissioner to demonstrate that other work exists in significant numbers in the national economy that the claimant can perform. The ALJ opined that the Social Security Regulations mandated a finding of "not disabled for a younger high school graduate despite an unskilled work background." Thus, in the opinion of the ALJ, the claimant was not disabled within the meaning of the Act.

## II. DISCUSSION

### A. The Legal Standard

To review the Commissioner's decision, the Court must determine whether (1) the Commissioner applied the correct legal standard, *see Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999); and (2) the decision is supported by substantial evidence, *see* 42 U.S.C. § 405(g); *Brown v. Apfel,* 174 F.3d 59, 61–62 (2d Cir.1999).

Substantial evidence is "more than a mere scintilla." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), and requires enough evidence that a reasonable person "might accept as adequate to support a conclusion." *Brown,* 174 F.3d at 62–63.

In determining whether the Commissioner's findings are supported by substantial evidence, the Court's task is "to examine the entire record, including contradictory evidence and evidence from which conflicting interferences can be drawn." *Id.* at 62 (quoting *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983) (per curiam)). In addition, the Court is mindful that "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Commissioner of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir.1998). Indeed, in evaluating the evidence, " 'the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon *de novo* review.' " *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991) (quoting *Valente v. Secretary of Health & Human Services,* 733 F.2d 1037, 1041 (2d Cir.1984)).

Remand of a disability claim for further administrative procedures is an appropriate remedy where, among other things, (1) "there are gaps in the administrative record or the ALJ has applied an improper legal standard . . .", *Rosa v. Callahan,* 168 F.3d 72, 82–83, or (2) new, material evidence is adduced that was not produced before the agency. *See Raitport v. Callahan,* 183 F.3d 101, 104 (2d Cir. 1999) (citation omitted)

### 1. The Treating Physician Rule

The Commissioner must accord special evidentiary weight to the opinion of the treating physician. *See Clark v. Commissioner of Soc. Sec.,* 143 F.3d 115, 119

(2d Cir.1998). The "treating physician rule," as it is known, "mandates that the medical opinion of the claimant's treating physician [be] given controlling weight if it is well supported by the medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir.2000); *see Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir.1999); *Clark*, 143 F.3d at 119; *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir.1993).

 If the opinion of the treating physician as to the nature and severity of the impairment is not giving controlling weight, the Commissioner must apply various factors to decide how much weight to give the opinion. *See Shaw*, 221 F.3d at 134; *Clark*, 143 F.3d at 118. These factors include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors. 20 C.F.R. § § 404.1527(d)(2), 416.927(d)(2); *see Clark*, 143 F.3d at 118. When the Commissioner chooses not to give the treating physician's opinion controlling weight, he must "give good reasons in his notice of determination or decision for the weight he gives [the claimant's] treating source's opinion." *Clark*, 143 F.3d at 118 (quoting C.F.R. §§ 404.1527(d)(2); 416.927(d)(2)).

 Here, the ALJ identifies Dr. Divack and Dr. Leone as the plaintiff's treating physicians. In addition to failing to acknowledge Dr. Wolf and Dr. Vitale, who were also treating physicians, the ALJ failed to state what weight he accorded to the opinion of Dr. Leone, the plaintiff's orthopedist. After multiple examinations, Dr. Leone consistently reported that the plaintiff suffered from drop foot, numbness in the lower extremities, a herniated disc and other neurological symptoms. However, the ALJ failed to indicate the weight, if any, that he accorded to these aspects of Dr. Leone's opinion. *See Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir.1993) (holding that the ALJ is required to articulate the weight that is given to treating doctor's conclusions). The ALJ also failed to provide sufficient reasons as to why controlling weight was not given to Dr. Leone's conclusions that the plaintiff was disabled. *See Clark*, 143 F.3d at 118 (When the Commissioner chooses not to give the treating physician's opinion controlling weight, he must "give good reasons in his notice of determination or decision for the weight he gives [the claimant's] treating source's opinion."); *see also Baybrook v. Chater*, 940 F.Supp. 668, 674 (D.Vt.1996) ("Because the ALJ failed to apply the [C.F.R. 1527(d)(2)] factors properly, it is impossible to assess whether the treating physician's opinion was properly rejected. In light of this failure, and because the record contains evidence supporting the findings of either disability or no disability, the case must be remanded for application of the correct legal standard for assessing the weight to accord the treating physician's opinion." (citation omitted)).

## 2. The ALJ's Assessment of the Medical Evidence

As stated above, the ALJ concluded that the opinions of treating physician Dr. Leone and consulting physician Dr. Barry supported the ALJ's conclusion that the plaintiff can perform light work. The ALJ based his conclusion on (1) Dr. Leone's September 22, 1999 records which characterized Teta as disabled regarding only heavy duty work; (2) Dr. Leone's November 17, 1999 recommendation that the plaintiff begin job retraining; (3) Dr. Barry's statement that the plaintiff was incapable of work requiring strenuous exertion,

active bending or heavy lifting; and (4) Dr. Ladopoulous' conclusion that the plaintiff retained the residual functional capacity to engage in light work.

In the Court's view, the fact that Dr. Leone and Dr. Barry indicated that the plaintiff was disabled and incapable of performing heavy work, without more, does not necessarily give rise to the inference that the plaintiff is therefore able to do light work. Furthermore, the conclusion of Dr. Ladopoulous, a non-treating physician, that the plaintiff is capable of doing light work is not conclusive. In fact, the ALJ's conclusion is contradicted by, among other things, the December 28, 1999 functional capacity questionnaire in which Dr. Leone opined that could walk only one block without rest, sit continuously for thirty minutes, stand continuously for ten minutes, for less than two hours a day, and lift ten pounds occasionally and less than ten pounds frequently and Dr. Leone's continued references that the plaintiff is disabled. The Court is also mindful that the plaintiff, in addition to this serious back condition, also suffers from diabetes mellitus.

 Here, the ALJ concluded that the plaintiff was able to perform a reduced range of light work which, during the course of an eight hour workday, entails standing/walking for up to six hours and lifting up to twenty pounds occasionally. However, if the ALJ had more seriously considered the treating physician's opinion in more depth, he might have found that Teta did not retain the capacity to perform work under these standards. Of particular concern is Dr. Leone's March 8, 2000 letter, which was not before the ALJ, but made part of the record, that indicated, among other things, that (1) if the plaintiff walked for more than fifteen minutes he could fall due to permanent nerve damage; (2) Teta could not sit for more than four hours because any type of position without a break would kink the blood supply to the spinal cord and place his nerves at further risk for damage; and (3) that the plaintiff would be able to sustain two hours of standing or walking without significant interruptions and breaks.

Accordingly, the ALJ's failure to credit the treating physicians' findings set forth above is cause for remand. *See Snell*, 177 F.3d at 133 ("Failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand."); *see also Ferraris v. Heckler*, 728 F.2d 582, 586–87 (2d Cir.1984) (case remanded because ALJ failed to consider treating physician's opinion as to claimants ability to sit for more than one to two hours at a time).

The ALJ also determined that Dr. Leone's November 17, 1999 medical record which states that the plaintiff was ready for job retraining was inconsistent with his answers on the December 28, 1999 residual functional capacity questionnaire. In the ALJ's view, because Dr. Leone failed to explain these inconsistencies, the ALJ accorded "greater weight" to Dr. Leone's indication that the plaintiff was ready for job retraining.

However, the ALJ erred by rejecting the treating physicians' diagnosis without first attempting to fill any perceived gaps in the administrative record. *See Schaal*, 134 F.3d at 505 ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*."); *see also Hartnett v. Apfel*, 21 F.Supp.2d 217, 221 (E.D.N.Y.1998) ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the record accordingly.")

■ "The ALJ generally has an affirmative obligation to develop the administrative record. This duty exists even [when] the claimant is represented by counsel." *Perez,* 77 F.3d at 47. Such is the case because "even if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from the treating physician['s] *sua sponte." See Schaal,* 134 F.3d at 505; *see also Rosa v. Callahan,* 168 F.3d 72, 82–83 (2d Cir.1999) ("Where there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the Commissioner for further development of the evidence.").

■ In the Court's view, the Commissioner failed to properly evaluate the plaintiff's subjective complaints of pain. Here, the ALJ concluded that because the "plaintiff's" alleged symptomatology and subjective restrictions stemming therefrom are largely unsubstantiated by the medical evidence, such symtomatology cannot be characterized as debilitating." Not only do the treating physician's reports completely refute this conclusion, but the ALJ failed to set forth his rationale "with sufficient specificity to enable [this Court] to decide whether [this] determination is supported by substantial evidence." *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984).

Finally, the Court notes in passing that a subsequent application for disability benefits, filed on January 11, 2001, which alleged an onset date of January 29, 2000, the day after the ALJ denied the May 28, 1999 application, was subsequently granted.

### III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED,** that the Commissioner's motion for judgment on the pleadings is **DENIED;** and it is further

**ORDERED,** that Teta's motion for judgment on the pleadings is **GRANTED;** and it is further

**ORDERED,** that the final decision of the Commissioner is vacated and this case is remanded to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g), for further administrative proceedings in accordance with this Order; and it is further

**ORDERED,** that the Clerk of the Court is directed to close this case.

**SO ORDERED.**