# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-31058

United States Court of Appeals
Fifth Circuit

**FILED**

July 17, 2015

Lyle W. Cayce
Clerk

LESLIE SUN,

   Plaintiff - Appellant

v.

CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL
SECURITY,

   Defendant - Appellee

Appeals from the United States District Court
for the Eastern District of Louisiana

Before JOLLY, HIGGINSON, and COSTA, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge.

Appellant Leslie Sun filed claims for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"), alleging disability under the Social Security Act because of a fractured ankle that took place in May 2011. An administrative law judge ("ALJ") denied her claim, emphasizing that "the record contains very minimal evidence of medical treatment since the alleged onset date and no evidence of medical treatment since August 2011." In denying her claim, the ALJ concluded that Sun's impairment did not equal the medical severity of an impairment listed in the C.F.R., which required Sun to show that her ankle injury rendered her unable to ambulate effectively for

a full year after the May 2011 onset. Sun requested review of her claim by the Appeals Council ("AC") and submitted additional medical records, which the ALJ did not have, indicating that Sun underwent surgery in December 2011. The AC made this additional evidence part of the record, but, providing no discussion of the newly submitted evidence, denied Sun's request for review. Sun now appeals, contending that the ALJ failed to fully and fairly develop the record by not obtaining all of her medical records before denying her claim. Because we are unable to determine, from review of the record as a whole, if substantial evidence supports the Commissioner's denial of benefits, we reverse and remand for further proceedings.

## FACTUAL BACKGROUND

### I.     Sun's Medical Records & Recovery

On May 28, 2011, Sun went to the emergency room in Marietta, Georgia, seeking treatment for a fractured ankle, which she reported was a result of a domestic altercation. On June 15, 2011, Sun underwent surgery—an "[o]pen reduction, internal fixation" of her left ankle fracture—and a metallic plate and screws were placed along the ankle fracture. Shortly after her surgery, Sun moved to Louisiana. On August 18, 2011, Sun went to North Oaks Hospital in Hammond, Louisiana to have her cast removed. At that time, the x-ray of her ankle was "unremarkable" and revealed that the "hardware [was] in place." However, seven days later, Sun returned to North Oaks Hospital complaining of pain in her ankle that was a "9/10" on the pain scale and reporting that she "noticed something poking out under the skin." The doctor examined Sun's ankle and noticed a "small nodule" but observed that there was "[n]o breaking skin no pressure noted to area" and that Sun was "in no acute distress." Sun left the hospital after being told that she needed to see an orthopedist. On August 31, 2011, Sun went to LSU Lallie Kemp Hospital Emergency Department, again reporting pain in her ankle. The examining

doctor noticed an "[a]rea of air evident about the screw . . . which could represent some mild loosening."

On October 11, 2011, Sun was examined by Dr. Catherine DiGiorgio, who noted in a written report that Sun "did not follow up at all whatsoever" after her first ankle surgery. Dr. DiGiorgio recorded that Sun's "pain is daily, constant 8-10/10, burning, sharp, no medications, and no doctor." Dr. DiGiorgio's functional assessment of Sun was that "[s]he can push, pull, and reach with no difficulty. She cannot bear weight on the left ankle, so she was unable to crouch, squat, or stoop." Dr. DiGiorgio concluded:

> . . . Currently, it appears that the assistive device is necessary. I believe the patient has not had a follow-up with the physician for postoperative surgery and screw appears to be emerging and docking out and orthopedic hardware that was placed is neglected. I believe the patient has neglected her health and she needs to be evaluated by a physician, who can follow up with her postoperatively. . . . [H]owever, the patient should not require crutches for longer than few weeks post surgery and she should not be using them any longer. However, given that she neglected to follow-up with the medical doctor for postoperative care, it is possible that she could require crutches right now because she could have abnormal healing. Again, I recommend this to be further evaluated by qualified orthopedic who can assess whether or not she needs to have surgery again or whether or not she had abnormal healing.

LSU clinical reports, which the ALJ did not have, indicate that in December 2011, about seven months after the onset of her injury, Sun had a second surgery, which included "[h]ardware removal and revision, open reduction and internal fixation" and bone grafting. The operating doctor detailed the surgery and noted that "[t]he patient will need to remain nonweightbearing for at least 6 weeks." On January 4, 2012, Sun had a two-

week follow-up at the LSU clinic, during which the doctor removed her splint, put her in a CAM boot, and instructed her to "remain[] nonweightbearing for [an] additional 6 to 8 weeks and return to clinic." Sun returned to the clinic on April 11, 2012, at which time a doctor reported that "images today show some small callus confirmation; however, still no union. Today, we will allow her to begin weightbearing in her CAM boot. We will set her up with physical therapy for range of motion and straightening of the right ankle as well as give her exercises to perform at home." The last relevant medical report is dated June 4, 2012, slightly over twelve months after her initial injury. On that date, the doctor reported "healing of the distal fibula where [Sun] had her iliac crest bone graft placed. Malleolar hardware appears to be intact with no hardware failure. Plate appears to be in good position. Overall, joints at the base appears [sic] to be normal with only minimal lateral subluxation . . . ." The doctor took Sun out of her CAM boot and instructed her to "be weightbearing as tolerated."

## II.    Sun's Application for DIB & SSI

Meanwhile, in June and July of 2011, shortly after her initial injury, Sun filed an application for DIB and SSI. Based on medical assessments and projections of what Sun's functional capacity would be by May 2012, one year after she was injured, the Commissioner denied her application. In December 2011, Sun requested a hearing by an ALJ. The Office of Disability Adjudication and Review asked Sun to sign a medical authorization form so that the office could obtain her medical records. On April 27, 2012, and again on May 24, 2012, someone from that office sent a letter to the LSU Interim Hospital requesting Sun's medical records. No response was received before the ALJ held a hearing on July 20, 2012.

### A. Hearing Before the ALJ

Sun waived her right to representation and participated in the hearing unrepresented. During the hearing, the ALJ explained that he had no medical

records regarding her second surgery or subsequent visits to the LSU clinic and that there was "no documentation at all since August of last year . . . no medical records at all." Acknowledging a possible evidentiary gap, the ALJ questioned Sun about her second surgery and subsequent recovery. Because Sun thought the ALJ already had her medical records, she did not bring a detailed list of when everything took place. Sun estimated that she had the boot on her foot for six to eight weeks and that she stopped using crutches "[p]robably in May" of 2012. Later, however, Sun claimed that she still "usually" needed to use a crutch, especially if she would be walking long distances. Sun did not use a crutch the day of the hearing. Sun testified extensively about her physical capabilities and limitations as well as her daily routine.

The ALJ also questioned a Vocational Expert about Sun's past work and present capabilities. The Vocational Expert testified that given Sun's physical capabilities, she would not be able to perform any past work and that she had no transferable skills. The Vocational Expert then listed some positions that were both unskilled and sedentary, such as "[i]nterviewers," "[r]eception and information clerks," and "[g]eneral office clerks" that Sun might be able to perform.

### B. The ALJ's Decision

On August 10, 2012, the ALJ issued a written decision, finding that Sun was not disabled under the Social Security Act. The ALJ went through the five-step analysis set forth in 20 C.F.R. §§ 404.1520, 416.920.[1] While the ALJ did find that Sun had a "severe impairment," he determined that it did not meet the medical severity of one of the impairments listed in the C.F.R. The

---

[1] Part 404 of 20 C.F.R. relates to disability insurance benefits. *See* 20 C.F.R. § 404.1. Part 416 relates to supplemental security income. *See* 20 C.F.R. § 416.101. As relevant here, the regulations are not materially different. We will therefore refer only to Part 404.

No. 14-31058

ALJ initially "credit[ed] [Sun's] testimony that her pain symptoms continued and that she underwent a second left ankle surgery in December 2011," however, he then repeatedly emphasized that the record contained "very minimal evidence of medical treatment since the alleged onset date and no evidence of medical treatment since August 2011." The ALJ stated that "[e]ven affording the claimant the benefit of the doubt that she has continued to seek medical care as alleged at the hearing, the record contains no evidence of physical findings to support her reported limitations and no evidence of doctor recommended activity restrictions." The ALJ noted that there were "several inconsistencies" in Sun's testimony that detracted from her credibility. Further, the ALJ declined to give great weight to the October 2011 evaluation by Dr. DiGiorgio because "the lack of consistent treatment suggests that [Sun] retained greater functional abilities than suggested by Dr. DiGiorgio." Ultimately, the ALJ determined that Sun was able to perform "light exertional" activities and would be able to perform jobs that "exist in significant numbers in the national economy." For this reason, the ALJ concluded that Sun was not disabled under the Social Security Act.

**C. Sun's Subsequent Appeals**

After the ALJ issued his decision, Sun hired an attorney to represent her and filed a "Request for Review of Hearing Decision/Order." Sun's attorney submitted the LSU medical records to the AC and amended her original application to request "a closed period of disability from the initial fracture of her leg May 18, 2011, through June 4, 2012 when she was known to be finally healed and weightbearing." Sun's lawyer also submitted a letter brief, arguing that the ALJ failed to fully and fairly develop the record. The AC made the LSU Clinical Reports part of the record. After considering "the reasons [Sun] disagree[d] with the decision and the additional evidence," the AC denied Sun's request for review. The AC provided no discussion or analysis of the additional

6

No. 14-31058

medical records, but, instead, simply concluded that the ALJ's "action, findings, or conclusion" were not "contrary to the weight of evidence of record."

Sun filed a complaint against the Acting Commissioner of the Social Security Administration ("Commissioner"), requesting judicial review of the final administrative decision, pursuant to 42 U.S.C. § 405(g). After an established briefing schedule, the magistrate judge issued a Findings and Recommendation, recommending that Sun's complaint be dismissed. On August 11, 2014, the district court adopted the magistrate's Findings and Recommendation, dismissed Sun's complaint, and entered a judgment in favor of the Commissioner. Sun timely appealed.

## DISCUSSION

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The C.F.R. sets forth a five-step sequential process for evaluating disability under the Act.[2] The burden of proof is on the claimant for the first four steps, but for the fifth step, the burden shifts to the Commissioner. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). Before denying Sun's claim, the ALJ went through each of the five evaluative steps. At step one and two, the ALJ found in favor of Sun—that she was not engaging in substantial gainful activity and

---

[2] The steps are: "(1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work." *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *see also* 20 C.F.R. § 404.1520(a)(4). If it is determined that the claimant is or is not disabled at any step, the evaluation is stopped and the decision is made. 20 C.F.R. § 404.1520(a)(4).

that she had a "severe impairment"—and neither party contests those findings. At step three, however, the ALJ found that Sun's impairment *did not* medically equal the severity of one of the listed impairments in appendix 1 of the C.F.R. *See* 20 C.F.R. Pt. 404, Subpt. P, App.1.   It is this determination that Sun contests.[3]

Relevant here, appendix 1, listing 1.06 provides that a person is disabled if she has a fracture of the femur, tibia, pelvis, or one or more of the tarsal bones, with:

> A.    Solid union not evident on appropriate medically acceptable imaging and not clinically solid; and
>
> B.    Inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur or is not expected to occur within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App. 1.   Section 1.00(B)(2)(b), entitled "What We Mean by Inability To Ambulate Effectively," provides:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .

---

[3] The regulation provides that if the ALJ finds in favor of the claimant at step three, he should end the evaluation and find that the claimant is disabled.   *See* 20 C.F.R. § 404.1520(a)(4)(iii).   In this case, the ALJ went on to steps four and five and determined that, based on Sun's residual functional capacity, she was capable of performing light work and would be able to perform jobs that exist in significant numbers in the national economy. Sun does not contest the ALJ's findings at steps four and five, but, instead, argues that the ALJ should have ended his evaluation at step three.

No. 14-31058

> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces . . . .

Relying on the LSU medical records,[4] Sun claims that, contrary to the ALJ's determination, she was not able to ambulate effectively by May 2012, twelve months after the onset of her injury, and, thus, her impairment met the severity of listing 1.06.[5]

## I.    Standard of Review

"[A]fter any final decision of the Commissioner of Social Security made after a hearing to which [an individual] was a party," that individual "may obtain a review of such decision by a civil action commenced within sixty days." 42 U.S.C. § 405(g). "Judicial review of the Commissioner's decision to deny benefits is limited to determining whether that decision is supported by substantial evidence and whether the proper legal standards are applied."

---

[4] Although the ALJ did not have the LSU medical records when he denied Sun's claim, they constitute part of the record upon which the Commissioner's final decision was based. *See Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005) ("[T]he Commissioner's final decision necessarily includes an Appeals Council's denial of a claimant's request for review. It follows that the record before the Appeals Council constitutes part of the record upon which the final decision is based.").

[5] The ALJ concluded that Sun's impairment did not equal the severity of an impairment listed in appendix 1, without first making an explicit finding regarding when Sun was able to ambulate effectively. By finding that Sun's medical impairment did not meet the severity of listing 1.06, however, the ALJ at least implicitly found that Sun returned to effective ambulation within twelve months of the onset of her injury. Later in his opinion, when discussing Sun's residual functional capacity, the ALJ noted that "the claimant's own testimony establishes that she was able to ambulate without an assistive device since May 2012."

9

No. 14-31058

*Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (citation omitted). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *James v. Bowen*, 793 F.2d 702, 705 (5th Cir. 1986). "In applying the substantial evidence standard, the court scrutinizes the record to determine whether such evidence is present, but may not reweigh the evidence or substitute its judgment for the Commissioner's." *Perez*, 415 F.3d at 461; *see also Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002) ("We will not re-weigh the evidence, try the questions *de novo*, or substitute our judgment for the Commissioner's, even if we believe the evidence weighs against the Commissioner's decision."). "Conflicts of evidence are for the Commissioner, not the courts, to resolve." *Perez*, 415 F.3d at 461.

## II.    Did the ALJ have a duty to obtain all of Sun's medical records?

On appeal, Sun argues that the ALJ "neglected to fully and fairly develop the record evidence" by not obtaining all of her medical records and that such failure prejudiced Sun and warrants reversal of the Commissioner's decision. This court has previously explained that because hearings under the Social Security Act are non-adversarial, "[t]he hearing examiner has the duty, accentuated in the absence of counsel, to develop the facts fully and fairly and to probe conscientiously for all of the relevant information." *Ware v. Schweiker*, 651 F.2d 408, 414 (5th Cir. 1981) (citation omitted). If the ALJ fails to fulfill this duty, "he does not have before him sufficient facts on which to make an informed decision and consequently the decision is not supported by substantial evidence." *James*, 793 F.2d at 704. For this reason, the court may reverse the ALJ's decision if the claimant can show that "(1) the ALJ failed to fulfill his duty to develop the record adequately and (2) that failure prejudiced the plaintiff." *Jones v. Astrue*, 691 F.3d 730, 733 (5th Cir. 2012).

10

While Sun is correct in her assertion that the ALJ had a duty to fully and fairly develop the facts, we do not endorse her understanding of that duty as requiring the ALJ to obtain all of a claimant's medical records before reaching a decision. This court has described the ALJ's duty as one of developing "all relevant facts," not collecting all existing records. *See Castillo v. Barnhart*, 325 F.3d 550, 552-53 (5th Cir. 2003) (per curiam) (describing the ALJ's "heightened duty to scrupulously and conscientiously explore all relevant *facts*" (emphasis added)); *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (per curiam) (describing the ALJ's "heightened duty to elicit all relevant *facts*" (emphasis added)). Consistent with that description, the court often focuses on the ALJ's questioning of the claimant in order to determine whether the ALJ gathered the information necessary to make a disability determination. *See, e.g.*, *Brock*, 84 F.3d at 728 (finding that the ALJ satisfied his duty by "extensively question[ing] [the claimant] about his education, training, and past work history; about the circumstances of his injury; and about his daily routine, pain, and physical limitations" and by inviting the claimant to "add other relevant evidence to the record"); *Castillo*, 325 F.3d at 552-53 (finding that ALJ satisfied his duty where he "questioned [the claimant] and her husband regarding her age, education, ability to read and comprehend, past relevant work, impairments, vision problems, and medical testing and treatment, and gave both [the claimant] and her husband opportunities to add anything else to the record"); *cf. Kane v. Heckler*, 731 F.2d 1216, 1218-20 (5th Cir. 1984) (finding that the ALJ failed to adequately develop the facts and record where the ALJ held a five-minute hearing and asked "only one perfunctory question about [the claimant's] subjective complaints" before denying her claim, despite the existence of objective medical-record evidence that supported those complaints). Further, imposing a duty on the ALJ to *obtain* all of a claimant's medical records would be in tension with the C.F.R.'s

explicit provision that the Commissioner will "make every reasonable effort to help [the claimant] get medical reports from [his or her] own medical sources" by making "an initial request for evidence from [the claimant's] medical source and . . . one followup request to obtain medical evidence necessary to make a determination," which the Commissioner did in this case.[6]     20 C.F.R. § 404.1512(d).

Moreover, even if the ALJ did have a duty to obtain all of Sun's medical records, his failure to do so in this case would not warrant reversal of the Commissioner's final decision. This court has held that "the Commissioner's final decision necessarily includes an Appeals Council's denial of a claimant's request for review" and that, therefore, "the record before the Appeals Council constitutes part of the record upon which the final decision is based."[7] *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005). According to *Higginbotham*, the Commissioner's final decision to deny Sun's claim, which includes the AC's denial of Sun's request for review, was based on all of Sun's medical records, including the LSU records that Sun now argues should have

---

[6] Sun cites only one case that discusses an ALJ's duty to obtain medical records, *Rosa v. Callahan*, 168 F.3d 72, 79-80 (2d Cir. 1999). However, the section of *Rosa* cited by Sun is entitled "The Treating Physician Rule" and discusses the general rule that "[t]he opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Id.* at 78-79. In *Rosa*, the ALJ rejected the treating physician's explicit finding that the claimant was disabled, emphasizing that certain portions of the physician's report were incomplete. *Id.* at 79. In that context, the Second Circuit explained that before rejecting the treating physician's diagnosis, the ALJ should have attempted to fill gaps in the administrative record by requesting additional records from the treating physician as well as medical records from other physicians, physical therapists, and hospitals that the claimant had visited. *Id.* at 79-80. The Second Circuit concluded that the ALJ improperly substituted her own expertise for that of the treating physician and committed legal error by not developing the factual record before rejecting the treating physician's disability finding. *Id.* at 80. While *Rosa* does discuss the value of obtaining a claimant's medical records, it does not impose on ALJs a duty to obtain medical records before reaching a decision.

[7] The court in *Higginbotham* acknowledged a circuit split on this issue. *Higginbotham*, 405 F.3d at 335-36.

been obtained by the ALJ.  *See id.*  Accordingly, even were there ALJ deficiency, it would not necessarily follow that the Commissioner's *final decision*, which includes the AC's consideration of the new evidence and subsequent denial of review, was also not supported by substantial evidence. Instead, this court must examine all of the evidence, including the new evidence submitted to the AC, and determine whether the Commissioner's final decision to deny Sun's claim was supported by substantial evidence.  *See Boyd*, 239 F.3d at 704 ("Judicial review of the Commissioner's decision to deny benefits is limited to determining whether that decision is supported by substantial evidence and whether the proper legal standards are applied." (citation omitted)); *Higginbotham*, 405 F.3d at 337 ("[T]he evidence submitted for the first time to the Appeals Council is part of the record on appeal because the statute itself provides that such record includes the 'evidence upon which the findings and decision complained of are based.'" (quoting 42 U.S.C. § 405(g))).

### III.   Did the AC properly consider the newly submitted evidence?

Relying on *Epps v. Harris*, 624 F.2d 1267 (5th Cir. 1980), Sun contends that the AC did not adequately evaluate the newly submitted evidence, as it provided no discussion of the evidence, and simply "found that this information does not provide a basis for changing the Administrative Law Judge's decision."  In *Epps*, this court reversed a decision by the Commissioner to deny a claimant's disability claim after finding that the AC had "perfunctorily adhered to the decision of the hearing examiner."  624 F.2d at 1273.  The court explained that "[a]lthough the Appeals Council acknowledged that Epps had submitted new evidence, it did not adequately evaluate it" and "[t]his failure alone makes us unable to hold that the Secretary's findings are supported by substantial evidence and requires us to remand this case for a determination of Epps' disability eligibility reached on the total record."  *Id.*

As the court in *Epps* recognized, judicial review of the Commissioner's decision is difficult, if not impossible, when the AC provides no discussion of relevant, new evidence. *Id.*  It is significant, however, that *Epps* involved the AC's affirmance and adoption of the ALJ's decision, rather than the AC's denial of a request for review. *Id.* at 1272; *see also Parks ex rel. D.P. v. Comm'r, Soc. Sec. Admin.*, 783 F.3d 847, 853 (11th Cir. 2015) ("*Epps* arose in a different procedural context, where the Appeals Council *affirmed* the decision of the administrative law judge. *Epps* has little bearing on a denial of a request for review." (citation and internal quotation marks omitted)).  When a claimant requests that the AC review an ALJ's decision, the AC "may deny a party's request for review *or* it may decide to review a case and make a decision." 20 C.F.R. § 404.981 (emphasis added).  "When the Appeals Council makes a decision," as it did in *Epps*, "it will follow the same rules for considering opinion evidence as [ALJs] follow." 20 C.F.R. § 404.1527; *see also Meyer v. Astrue*, 662 F.3d 700, 706 (4th Cir. 2011) ("Only if the Appeals Council *grants* a request for review and issues its own decision on the merits is the Appeals Council required to make findings of fact and explain its reasoning.").  The AC's decision then becomes binding unless the claimant seeks judicial review. 20 C.F.R. § 404.981.  On the other hand, when the AC denies the claimant's request for review, as it did in this case, that denial becomes part of the Commissioner's final decision, *Higginbotham*, 405 F.3d at 336-37, but the ALJ's decision remains binding, 20 C.F.R. § 404.981.

In deciding whether to deny the claimant's request for review, the AC must consider and evaluate any "new and material evidence" that is submitted, if it relates to the period on or before the ALJ's decision. 20 C.F.R. § 404.970(b). If the AC finds that the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence currently of record," the AC will then review the case. *Id.*  Otherwise, it will deny the claimant's request for review. The regulations

do not require the AC to provide a discussion of the newly submitted evidence or give reasons for denying review.[8] *See Meyer*, 662 F.3d at 706 ("In sum, the regulatory scheme does not require the Appeals Council to do anything more than what it did in this case, *i.e.,* 'consider new and material evidence . . . in deciding whether to grant review.'" (citation omitted)); *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 785 (11th Cir. 2014) ("[W]e hold that the Appeals Council is not required to explain its rationale when denying a request for review."); *Martinez v. Barnhart*, 444 F.3d 1201, 1208 (10th Cir. 2006) ("[The claimant] points to nothing in the statutes or regulations that would require such an analysis where new evidence is submitted and the Appeals Council denies review.").

It is also important to note that in *Epps*, unlike in the present case, the ALJ based its findings on a fact that was later *directly contradicted* by the new evidence submitted to the AC, yet the AC adopted the ALJ's decision unchanged, without addressing that new evidence. 624 F.2d at 1273; *see also Mitchell*, 771 F.3d at 783 ("[T]he record in *Epps* provided us with an affirmative basis for concluding the Appeals Council failed to evaluate the claimant's new evidence."). Thus, there was no way to reconcile the AC's adoption of the ALJ's

---

[8] In 1995, the Social Security Administration issued a memorandum that temporarily suspended the previous requirement that the AC articulate findings when it considers new evidence and denies review. *See* Office of Disability Adjudication and Review, Social Security Administration, HALLEX I-3-5-90, The Request for Review Workload, From the Executive Director, Office of Appellate Operations (July 20, 1995), *available at* 2001 WL 34096367 ("Effective immediately, we are temporarily suspending the requirement for a detailed discussion of additional evidence and for specific responses to contentions in denial notices."); *see also Higginbotham*, 405 F.3d at 335 n.1 (rejecting a similar argument that the AC failed to explain its weighing of the evidence, stating that "the requirement of a detailed discussion of additional evidence was suspended by a memorandum from the Executive Director of Appellate Operations dated July 20, 1995"). According to the Executive Director, the suspension was necessary to help alleviate the rapidly growing workload of the AC. In 2012, the AC officially adopted the 1995 initiative. *See* Office of Disability Adjudication and Review, Social Security Administration, HALLEX I-3-5-30, Consideration of Legal Arguments or Contentions (Dec. 27, 2012), *available at* 1993 WL 643144.

decision with its consideration of the new evidence. Here, on the other hand, the newly submitted evidence is significant, and casts doubt on the soundness of the ALJ's findings, but it does not necessarily contradict the ALJ's decision. As the district court correctly determined, the Commissioner's decision to reject Sun's claim can be reconciled with the LSU medical records. Therefore, we cannot be sure, as the court was in *Epps*, that the AC neglected to evaluate the new evidence.

In *Meyer v. Astrue*, the Fourth Circuit faced a similar situation and remanded the case to the Commissioner for further fact finding on the evidence that was submitted to and considered by the AC. 662 F.3d at 707. The Fourth Circuit recognized that the AC was under no obligation to provide a detailed discussion of the new evidence, but shared our concern that meaningful judicial review of the Commissioner's decision is challenging when there has been no discussion of significant evidence below. *Id.* at 706-07; *see also Martinez*, 444 F.3d at 1208 (noting that an express analysis by the AC would be "helpful for purposes of judicial review"). The court concluded that it could not determine whether substantial evidence supported the Commissioner's decision because the new evidence was significant, but "not . . . one-sided," and because no fact finder had made findings as to that evidence. 662 F.3d at 707. Accordingly, the court reversed the Commissioner's decision and remanded the case for further fact finding. *Id.*

Like the Fourth Circuit in *Meyer*, we are unable to determine, considering the record as a whole, whether substantial evidence supports the ALJ's denial of benefits here. The ALJ found that Sun was able to ambulate effectively within a year of her injury's onset and had the residual functional capacity to perform light work. These findings may still be correct and supported by substantial evidence, but the LSU medical records and Sun's second surgery create considerable uncertainty that has not been addressed or

resolved by a fact finder below.  In reaching his conclusion, the ALJ highlighted the lack of medical evidence in the record.  The ALJ claimed to credit Sun's testimony about her pain and December 2011 surgery, but then repeated that "the record contains very minimal evidence of medical treatment since the alleged onset date and no evidence of medical treatment since August 2011" and "no evidence of physical findings to support her reported limitations and no evidence of doctor recommended activity restrictions."  The ALJ indicated that the discrepancy between Sun's testimony and the lack of medical evidence contributed to his determination that Sun was not credible.  Even more significant, the ALJ declined to give great weight to Dr. DiGiorgio's evaluation of Sun because "the lack of consistent treatment suggests that [Sun] retained greater functional abilities" than Dr. DiGiorgio suggested.  Though the LSU medical records are not decisive, they are certainly significant, as they support Sun's testimony and indicate that as late as April 2012 there was "still no union" in Sun's ankle, and she was only "begin[ing] weightbearing in her cam boot."  Despite the significance of this new evidence, no fact finder has made findings regarding the LSU clinical reports or attempted to reconcile these reports with other conflicting and supporting evidence in the record.  "Assessing the probative value of competing evidence is quintessentially the role of the fact finder.  We cannot undertake it in the first instance."  *Meyer*, 662 F.3d at 707; *see also Perez*, 415 F.3d at 461 ("Conflicts of evidence are for the Commissioner, not the courts, to resolve.").

## CONCLUSION

For the reasons explained above, we REVERSE the judgment of the district court and REMAND with instructions to REVERSE the decision of the Commissioner and REMAND the case for a rehearing pursuant to 42 U.S.C. § 405(g).  In doing so, we express no opinion as to whether Sun can ultimately establish that she is disabled within the meaning of the Social Security Act.